BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
*v.* FEDERAL LABOR RELATIONS
AUTHORITY ET AL.

No. 82–799.   Argued October 11, 1983—Decided November 29, 1983

*Carolyn F. Corwin* argued the cause for petitioner. With her on the briefs were *Solicitor General Lee, Assistant Attorney General McGrath, Deputy Solicitor General Geller, William Kanter,* and *Douglas Letter.*

*Ruth E. Peters* argued the cause for respondents. *Steven H. Svartz* and *William E. Persina* filed a brief for respondent Federal Labor Relations Authority. *Robert M. Tobias, Lois G. Williams,* and *Kerry L. Adams* filed a brief for respondent National Treasury Employees Union.*

JUSTICE BRENNAN delivered the opinion of the Court.

Title VII of the Civil Service Reform Act of 1978 (Act), Pub. L. 95–454, 92 Stat. 1214, 5 U. S. C. § 7131(a) (1982 ed.), requires federal agencies to grant "official time" to employees

---

*\*Edwin Vieira, Jr.,* filed a brief for the Public Service Research Council as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the American Federation of Government Employees, AFL–CIO, by *Mark D. Roth* and *James R. Rosa;* and for the National Federation of Federal Employees by *Catherine Waelder.*

representing their union in collective bargaining with the agencies. The grant of official time allows the employee negotiators to be paid as if they were at work, whenever they bargain during hours when they would otherwise be on duty. The Federal Labor Relations Authority (FLRA or Authority) concluded that the grant of official time also entitles employee union representatives to a per diem allowance and reimbursement for travel expenses incurred in connection with collective bargaining. 2 F. L. R. A. 265 (1979). In this case, the Court of Appeals for the Ninth Circuit enforced an FLRA order requiring an agency to pay a union negotiator travel expenses and a per diem, finding the Authority's interpretation of the statute "reasonably defensible." 672 F. 2d 732, 733 (1982). Three other Courts of Appeals have rejected the FLRA's construction of the Act.[1] We granted certiorari to resolve this conflict, 459 U. S. 1145 (1983), and now reverse.

# I

## A

Title VII of the Civil Service Reform Act, part of a comprehensive revision of the laws governing the rights and obligations of civil servants, contains the first statutory scheme governing labor relations between federal agencies and their employees. Prior to enactment of Title VII, labor-management relations in the federal sector were governed by a program established in a 1962 Executive Order.[2] The Executive Order regime, under which federal employees had

---

[1] *Florida National Guard* v. *FLRA*, 699 F. 2d 1082 (CA11 1983), cert. pending, No. 82–1970; *United States Dept. of Agriculture* v. *FLRA*, 691 F. 2d 1242 (CA8 1982), cert. pending, No. 82–979; *Division of Military & Naval Affairs* v. *FLRA*, 683 F. 2d 45 (CA2 1982), cert. pending, No. 82–1021.

[2] Exec. Order No. 10988, 3 CFR 521 (1959–1963 Comp.). The Executive Order program was revised and continued by Exec. Order No. 11491, 3 CFR 861 (1966–1970 Comp.), as amended by Exec. Orders Nos. 11616, 11636, and 11838, 3 CFR 605, 634, 957 (1971–1975 Comp.).

limited rights to engage in concerted activity, was most recently administered by the Federal Labor Relations Council, a body composed of three Executive Branch management officials whose decisions were not subject to judicial review.[3]

The new Act, declaring that "labor organizations and collective bargaining in the civil service are in the public interest," 5 U. S. C. § 7101(a) (1982 ed.), significantly strengthened the position of public employee unions while carefully preserving the ability of federal managers to maintain "an effective and efficient Government," § 7101(b).[4]  Title VII expressly protects the rights of federal employees "to form, join, or assist any labor organization, or to refrain from any such activity," § 7102, and imposes on federal agencies and labor organizations a duty to bargain collectively in good faith, §§ 7116(a)(5) and (b)(5).  The Act excludes certain management prerogatives from the scope of negotiations, although an agency must bargain over the procedures by which these management rights are exercised.  See § 7106.  In general, unions and federal agencies must negotiate over terms and conditions of employment, unless a bargaining proposal is inconsistent with existing federal law, rule, or regulation.  See §§ 7103(a), 7114, 7116, and 7117(a).  Strikes and certain other forms of concerted actitivies by federal employees are illegal and constitute unfair labor practices under the Act, § 7116(b)(7)(A).

The Act replaced the management-controlled Federal Labor Relations Council with the FLRA, a three-member independent and bipartisan body within the Executive Branch with responsibility for supervising the collective-bargaining process and administering other aspects of federal labor relations established by Title VII.  § 7104.  The Authority, the role of which in the public sector is analogous

---

[3] The Council was established by Executive Order No. 11491 in 1970.

[4] Certain federal employees, including members of the military and the Foreign Service, and certain federal agencies, including the Federal Bureau of Investigation and the Central Intelligence Agency, are excluded from the coverage of Title VII.  5 U. S. C. §§ 7102(a)(2) and (3) (1982 ed.).

to that of the National Labor Relations Board in the private sector, see H. R. Rep. No. 95–1403, p. 41 (1978), adjudicates negotiability disputes, unfair labor practice complaints, bargaining unit issues, arbitration exceptions, and conflicts over the conduct of representational elections. See §§ 7105(a)(2) (A)–(I). In addition to its adjudicatory functions, the Authority may engage in formal rulemaking, § 7134, and is specifically required to "provide leadership in establishing policies and guidance relating to matters" arising under the Act, § 7105(a)(1). The FLRA may seek enforcement of its adjudicatory orders in the United States courts of appeals, § 7123(b), and persons, including federal agencies, aggrieved by any final FLRA decision may also seek judicial review in those courts, § 7123(a).

## B

Petitioner, the Bureau of Alcohol, Tobacco and Firearms (BATF or Bureau), an agency within the Department of the Treasury, maintained a regional office in Lodi, California. Respondent National Treasury Employees Union (NTEU or Union) was the exclusive representative of BATF employees stationed in the Lodi office. In November 1978, the Bureau notified NTEU that it intended to move the Lodi office to Sacramento and to establish a reduced duty post at a new location in Lodi. The Union informed BATF that it wished to negotiate aspects of the move's impact on employees in the bargaining unit. As its agent for these negotiations, the Union designated Donald Pruett, a BATF employee and NTEU steward who lived in Madera, California, and was stationed in Fresno. Bureau officials agreed to meet with Pruett at the new offices and discuss the planned move. Pruett asked that his participation in the discussions be classified as "official time" so that he could receive his regular salary while attending the meetings. The Bureau denied the request and directed Pruett to take either annual leave or leave without pay for the day of the meeting.

On February 23, 1979, Bureau officials met with Pruett at the proposed new Sacramento offices and inspected the phys-

ical amenities, including the restrooms, dining facilities, and parking areas. Pruett and the BATF officials then drove to Lodi where they conducted a similar inspection of the new reduced duty post. Finally, the group repaired to the existing Lodi office where they discussed the planned move. After Pruett expressed his general satisfaction with the new facilities, he negotiated with the agency officials about such matters as parking arrangements, employee assignments, and the possibility of excusing employee tardiness for the first week of operations in the Sacramento office. Once the parties reached an agreement on the move, Pruett drove back to his home in Madera.

Pruett had spent 11½ hours traveling to and attending the meetings, and had driven more than 300 miles in his own car. When he renewed his request to have his participation at the meetings classified as official time, the Bureau informed him that it did not reimburse employees for expenses incurred in negotiations and that it granted official time only for quarterly collective-bargaining sessions and not for midterm discussions like those involved here. In June 1979, the Union filed an unfair labor practice charge with the FLRA, claiming that BATF had improperly compelled Pruett to take annual leave for the February 23 sessions.

While the charge was pending, the FLRA issued an "Interpretation and Guidance" of general applicability which required federal agencies to pay salaries, travel expenses, and per diem allowances to union representatives engaged in collective bargaining with the agencies.[5] 2 F. L. R. A. 265 (1979). The Interpretation relied on 5 U. S. C. § 7131(a)

---

[5] Although the Authority invited interested persons to express their views prior to adoption of the Interpretation, see Notice Relating to Official Time, 44 Fed. Reg. 42788 (1979), the decision apparently was issued not under the FLRA's statutory power to promulgate regulations, § 7134, but rather under § 7105(a)(1), which requires the Authority to provide leadership in establishing policies and guidance relating to federal labor-management relations. See Brief for Respondent FLRA 11, n. 10.

(1982 ed.), which provides that "[a]ny employee representing an exclusive representative in the negotiation of a collective bargaining agreement . . . shall be authorized official time for such purposes . . . ." The Authority concluded that an employee's entitlement to official time under this provision extends to "all negotiations between an exclusive representative and an agency, regardless of whether such negotiations pertain to the negotiation or renegotiation of a basic collective bargaining agreement." 2 F. L. R. A., at 268. The Authority further determined that § 7131(a) requires agencies to pay a per diem allowance and travel expenses to employees representing their union in such negotiations. *Id.*, at 270.

Based on the NTEU's pending charge against the Bureau, the General Counsel of the Authority issued a complaint and notice of hearing, alleging that the BATF had committed an unfair labor practice by refusing to grant Pruett official time for the February 23 meetings.[6] During the course of a subsequent hearing on the charge before an Administrative Law Judge, the complaint was amended to add a claim that, in addition to paying Pruett's salary for the day of the meetings, the BATF should have paid his travel expenses and a per diem allowance. Following the hearing, the ALJ deter-

---

[6] Title 5 U. S. C. § 7118 (1982 ed.) provides in part:

"(a)(1) If any agency or labor organization is charged by any person with having engaged in or engaging in an unfair labor practice, the General Counsel shall investigate the charge and may issue and cause to be served upon the agency or labor organization a complaint. . . ."

The complaint issued by the General Counsel in this case relied on § 7116, which provides in part:

"(a) For the purposes of this chapter, it shall be an unfair labor practice for an agency—

"(1) to interfere with, restrain, or coerce any employee in the exercise by the employee of any right under this chapter;

.      .      .      .      .

"(8) to otherwise fail or refuse to comply with any provision of this chapter."

mined that negotiations had in fact taken place between Pruett and BATF officials at the February 23 meetings. Bound to follow the recent FLRA Interpretation and Guidance, the ALJ concluded that the Bureau had committed an unfair labor practice by failing to comply with § 7131(a). Accordingly, he ordered the Bureau to pay Pruett his regular salary for the day in question, as well as his travel costs and a per diem allowance. The ALJ also required the BATF to post a notice stating that the agency would do the same for all employee union representatives in future negotiations. The Bureau filed exceptions to the decision with the Authority, which, in September 1980, affirmed the decision of the ALJ, adopting his findings, conclusions, and recommended relief. 4 F. L. R. A. 288 (1980).

The Bureau sought review in the United States Court of Appeals for the Ninth Circuit, and the Union intervened as a party in that appeal. The Bureau challenged both the FLRA's conclusion that § 7131(a) applies to midterm negotiations and its determination that the section requires payment of travel expenses and a per diem allowance. After deciding that the Authority's construction of its enabling Act was entitled to deference if it was "reasoned and supportable," 672 F. 2d, at 735–736, the Court of Appeals enforced the Authority's order on both issues. *Id.*, at 737, 738. On certiorari to this Court, petitioner does not seek review of the holding with respect to midterm negotiations. Only that aspect of the Court of Appeals' decision regarding travel expenses and per diem allowances is at issue here.

## II

The FLRA order enforced by the Court of Appeals in this case was, as noted, premised on the Authority's earlier construction of § 7131(a) in its Interpretation and Guidance. Although we have not previously had occasion to consider an interpretation of the Civil Service Reform Act by the FLRA, we have often described the appropriate standard of judicial

review in similar contexts.[7]   Like the National Labor Relations Board, see, *e. g.*, *NLRB* v. *Erie Resistor Corp.*, 373 U. S. 221, 236 (1963), the FLRA was intended to develop specialized expertise in its field of labor relations and to use that expertise to give content to the principles and goals set forth in the Act.   See § 7105; H. R. Rep. No. 95–1403, p. 41 (1978).   Consequently, the Authority is entitled to considerable deference when it exercises its "special function of applying the general provisions of the Act to the complexities" of federal labor relations.   Cf. *NLRB* v. *Erie Resistor Corp.*, *supra*, at 236.   See also *Ford Motor Co.* v. *NLRB*, 441 U. S. 488, 496 (1979); *NLRB* v. *Iron Workers*, 434 U. S. 335, 350 (1978); *NLRB* v. *Truck Drivers*, 353 U. S. 87, 96 (1957).

On the other hand, the "deference owed to an expert tribunal cannot be allowed to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress." *American Ship Building Co.* v. *NLRB*, 380 U. S. 300, 318 (1965). Accordingly, while reviewing courts should uphold reasonable and defensible constructions of an agency's enabling Act, *NLRB* v. *Iron Workers*, *supra*, at 350, they must not "rubber-stamp . . . administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute."   *NLRB* v. *Brown*, 380 U. S. 278, 291–292 (1965).   See *Chemical & Alkali Workers* v. *Pittsburgh Plate Glass Co.*, 404 U. S. 157,

---

[7] The decisions of the FLRA are subject to judicial review in accordance with the Administrative Procedure Act (APA), 5 U. S. C. § 706.   See 5 U. S. C. § 7123(c) (1982 ed.).   The APA requires a reviewing court to "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action."   § 706.   The court must set aside agency actions and conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."   §§ 706(2)(A) and (C).

166 (1971).[8]  Guided by these principles, we turn to a consideration of the FLRA's construction of § 7131(a).

### III

Title 5 U. S. C. § 7131(a) (1982 ed.) provides in full:

"Any employee representing an exclusive representative in the negotiation of a collective bargaining agreement

---

[8] Petitioner suggests that we should accord little deference to the Authority's decision in this case for two reasons.  First, petitioner contends that the FLRA's conclusion that employee negotiators are entitled to travel expenses and a per diem allowance was based largely on the Authority's reading of the Travel Expense Act, 5 U. S. C. § 5702 (1982 ed.), a statute the FLRA does not administer.  As we understand the FLRA's decision, however, the Authority's view that the Travel Expense Act supported its conclusion derived primarily from its interpretation of § 7131(a).  See *infra*, at 106.

Second, petitioner argues that the Interpretation and Guidance is entitled to less weight since it was apparently an "interpretative rule" rather than an "administrative regulation."  See n. 5, *supra*.  Congress did, however, afford the FLRA broad authority to establish policies consistent with the Act, see §§ 7105 and 7134, and the Interpretation and Guidance was attended by at least some of the procedural characteristics of a rulemaking.  See n. 5, *supra*.  See 5 U. S. C. § 553.  Compare *FEC* v. *Democratic Senatorial Campaign Committee*, 454 U. S. 27, 37 (1981), with *General Electric Co.* v. *Gilbert*, 429 U. S. 125, 141–142 (1976).  In any event, we find it unnecessary to rest our decision on a precise classification of the FLRA's action.  As we explain in the text, an agency acting within its authority to make policy choices consistent with the congressional mandate should receive considerable deference from courts, provided, of course, that its actions conform to applicable procedural requirements and are not "arbitrary, capricious, an abuse of discretion, or not otherwise in accordance with law," 5 U. S. C. § 706(2)(A).  See, *e. g.*, *Batterton* v. *Francis*, 432 U. S. 416, 424–426 (1977); *FCC* v. *Pottsville Broadcasting Co.*, 309 U. S. 134, 137–138 (1940).  When an agency's decision is premised on its understanding of a specific congressional intent, however, it engages in the quintessential judicial function of deciding what a statute means.  In that case, the agency's interpretation, particularly to the extent it rests on factual premises within its expertise, may be influential, but it cannot bind a court.  *General Electric Co.* v. *Gilbert, supra; Zuber* v. *Allen*, 396 U. S. 168, 192–193 (1969); *Skidmore* v. *Swift & Co.*, 323 U. S. 134, 140 (1944).  For the reasons set out below, we conclude that the FLRA's decision in this case neither rests on specific congressional intent nor is consistent with the policies underlying the Act.

under this chapter shall be authorized official time for such purposes, including attendance at impasse proceeding, during the time the employee otherwise would be in a duty status. The number of employees for whom official time is authorized under this subsection shall not exceed the number of individuals designated as representing the agency for such purposes."

According to the House Committee that reported the bill containing § 7131, Congress used the term "official time" to mean "paid time." See H. R. Rep. No. 95–1403, p. 58 (1978). In light of this clear expression of congressional intent, the parties agree that employee union negotiators are entitled to their usual pay during collective-bargaining sessions that occur when the employee "otherwise would be in a duty status." Both the Authority, 2 F. L. R. A., at 269, and the Court of Appeals, 672 F. 2d, at 737, recognized that there is no corresponding expression, either in the statute or the extensive legislative history, of a congressional intent to pay employee negotiators travel expenses and per diem allowances as well.

Despite this congressional silence, respondents advance several reasons why the FLRA's determination that such payments are required is consistent with the policies underlying the Act. Each of these arguments proceeds from the assumption that, by providing employee negotiators with official time for bargaining, Congress rejected the model of federal labor relations that had shaped prior administrative practice. In its place, according to respondents, Congress substituted a new vision of collective bargaining under which employee negotiators, like management representatives, are considered "on the job" while bargaining and are therefore entitled to all customary forms of compensation, including travel expenses and per diem allowances.[9] In order to evaluate this claim, it is necessary briefly to review the rights of

_____

[9] In the Interpretation and Guidance, the FLRA also noted that it had previously construed § 7131(c), which authorizes "official time" for em-

employee negotiators to compensation prior to adoption of the Act.

A

Under the 1962 Executive Order establishing the first federal labor relations program, the decision whether to pay union representatives for the time spent in collective bargaining was left within the discretion of their employing agency,[10] apparently on the ground that, without some control by management, the length of such sessions could impose too great a burden on Government business. See Report of the President's Task Force on Employee-Management Relations in the Federal Service, reprinted in Legislative History of the Federal Service Labor-Management Relations Statute, Title VII of the Civil Service Reform Act of 1978, pp. 1177, 1203 (Comm. Print 1979) (hereinafter Leg. Hist.). Under this early scheme, employee negotiators were not entitled to per diem allowances and travel expenses, on the view that they were engaged, not in official business of the Government, but rather in activities "primarily in the interest of the employee organization." 44 Comp. Gen. 617, 618 (1965).[11]

---

ployee representatives appearing before the Authority, to require the payment of travel expenses and a per diem allowance. 2 F. L. R. A. 265, 270 (1979). See 5 CFR § 2429.13 (1983). The fact that the Authority interpreted two similar provisions of the Act consistently does not, however, demonstrate that either interpretation is correct. We, of course, express no view as to whether different considerations uniquely applicable to proceedings before the Authority might justify the FLRA's interpretation of § 7131(c).

[10] Section 9 of Executive Order No. 10988 encouraged agencies to conduct general consultations with labor representatives on official time, but left them free to conduct collective-bargaining sessions "during the non-duty hours of the employee organization representatives involved in such negotiations." 3 CFR 521, 524–525 (1959–1963 Comp.).

[11] The 1962 Executive Order contained no reference to travel expenses or per diem allowances. The decision that such payments were not available was made in 1965 by the Comptroller General, 44 Comp. Gen. 617, who is authorized to give agencies guidance concerning such disburse-

Executive Order No. 11491, which became effective in 1970, cut back on the previous Order by providing that employees engaged in negotiations with their agencies could not receive official time, even at the agencies' discretion. See 3 CFR 861–862, 873–874 (1966–1970 Comp.). Again, the prohibition was based on the view that employee representatives work for their union, not for the Government, when negotiating an agreement with their employers. See Leg. Hist., at 1167. In 1971, however, at the recommendation of the Federal Labor Relations Council, an amending Executive Order allowed unions to negotiate with agencies to obtain official time for employee representatives, up to a maximum of either 40 hours, or 50% of the total time spent in bargaining. Exec. Order No. 11616, 3 CFR 605 (1971–1975 Comp.). The Council made clear that this limited authorization, which was intended "to maintain a reasonable policy with respect to union self-support and an incentive to economical and businesslike bargaining practices," Leg. Hist., at 1169, did not permit "[o]vertime, premium pay, or travel expenditures." *Id.*, at 1264.

The Senate version of the bill that became the Civil Service Reform Act would have retained the last Executive Order's restrictions on the authorization of official time. S. Rep.

ments. See 31 U. S. C. § 3529 (1982 ed.). The following year, the Comptroller General modified his position and approved new guidelines issued by the Civil Service Commission. 46 Comp. Gen. 21, 21–22. The guidelines provided that, while employees should not generally be allowed travel expenses to attend negotiations, such expenses would be approved if an agency head certified that the employee representatives' travel would be in the "primary interest of the Government." *Ibid.* An agency might make such a certification when, for example, it would be more convenient for management to meet at a particular site and more economical to pay the employees' costs of traveling there than to pay the cost for agency representatives to travel to a different site. *Ibid.* This exception to the earlier prohibition on travel expenses was, by its terms, consistent with the Comptroller General's view that employee negotiators act principally in the interest of their union and not on official business for the United States.

No. 95–969, p. 112 (1978). Congress instead adopted the section in its present form, concluding, in the words of one Congressman, that union negotiators "should be allowed official time to carry out their statutory representational activities just as management uses official time to carry out its responsibilities." 124 Cong. Rec. 29188 (1978) (remarks of Rep. Clay). See H. R. Conf. Rep. No. 95–1717, p. 111 (1978).

## B

Respondents suggest that, by rejecting earlier limitations on official time, Congress repudiated the view that employee negotiators work only for their union and not for the Government. Under the new vision of federal labor relations postulated by respondents, civil servants on both sides of the bargaining table are engaged in official business of the Government and must be compensated equally. Because federal employees representing the views of management receive travel expenses and per diem allowances, federal employees representing the views of labor are entitled to such payments as well. In support of this view, respondents rely on the Act's declaration that public sector collective bargaining is in "the public interest" and "contributes to the effective conduct of public business," § 7101(a), as well as on a number of specific provisions in the Act intended to equalize the position of management and labor. For instance, the Act requires agencies to deduct union dues from employees' paychecks and to transfer the funds to the union at no cost, § 7115(a);[12] in addition, agencies must furnish a variety of data useful to unions in the collective-bargaining process, § 7114(b)(4). Respondents also contend that Congress employed the term "official time" in § 7131 specifically to indicate that employee negotiators are engaged in Government business and therefore entitled to all of their usual forms of compensation.

---

[12] Under the Executive Order regime, unions had to negotiate for dues deductions and were generally charged a fee for the service. See *Information Announcement*, 1 F. L. R. C. 676, 677 (1973).

Although Congress certainly could have adopted the model of collective bargaining advanced by respondents, we find no indications in the Act or its legislative history that it intended to do so. The Act's declaration that collective bargaining contributes to efficient government and therefore serves the public interest does not reflect a dramatic departure from the principles of the Executive Order regime under which employee negotiators had not been regarded as working for the Government. To the contrary, the declaration constitutes a strong congressional endorsement of the policy on which the federal labor relations program had been based since its creation in 1962. See, *e. g.*, Exec. Order No. 10988, 3 CFR 521 (1959–1963 Comp.) ("participation of employees in the formulation and implementation of personnel policies affecting them contributes to effective conduct of public business"); Exec. Order No. 11491, 3 CFR 861 (1966–1970 Comp.) ("public interest requires . . . modern and progressive work practices to facilitate improved employee performance and efficiency" and efficient government is "benefited by providing employees an opportunity to participate in the formulation and implementation of personnel policies and practices affecting the conditions of their employment"). See also S. Rep. No. 95–969, p. 12 (1978); 124 Cong. Rec. 29182 (1978) (remarks of Rep. Udall) ("What we really do is to codify the 1962 action of President Kennedy in setting up a basic framework of collective bargaining for Federal employees").[13]

---

[13] We do not read Representative Udall's remarks to suggest that the Authority is bound by administrative decisions made under the Executive Order regime. The Act explicitly encourages the Authority to establish policies and provide guidance in the federal labor relations field, § 7105(a)(1), and there are undoubtedly areas in which the FLRA, like the National Labor Relations Board, enjoys considerable freedom to apply its expertise to new problems, provided it remains faithful to the fundamental policy choices made by Congress. See *supra*, at 96–98, and n. 8. See also § 7135(b) (decisions under Executive Order regime remain in effect unless revised by President or superseded by Act or regulations or decisions thereunder).

Nor do the specific provisions of the Act aimed at equalizing the positions of management and labor suggest that Congress intended employee representatives to be treated as though they were "on the job" for all purposes. Indeed, the Act's provision of a number of specific subsidies for union activities supports precisely the opposite conclusion. As noted above, Congress expressly considered and ultimately rejected the approach to paid time that had prevailed under the Executive Order regime. See *supra*, at 101–102. In contrast, there is no reference in the statute or the legislative history to travel expenses and per diem allowances, despite the fact that these kinds of payments had also received administrative attention *prior* to passage of the Act, see *supra*, at 100, and n. 11. There is, of course, nothing inconsistent in paying the salaries, but not the expenses, of union negotiators. Congress might well have concluded that, although union representatives should not be penalized by a loss in salary while engaged in collective bargaining, they need not be further subsidized with travel and per diem allowances. The provisions of the Act intended to facilitate the collection of union dues, see § 7115, certainly suggest that Congress contemplated that unions would ordinarily pay their own expenses.

Respondents also find their understanding of the role of union representatives supported by Congress' use of the phrase "official time" in § 7131(a). For respondents, the use of this term indicates an intent to treat employee negotiators "as doing the government's work for all the usual purposes," and therefore entitled to "all attributes of employment," including travel expenses and a per diem allowance. Brief for Respondent NTEU 24–28. They suggest that, if Congress intended to maintain only the employees' salaries, it would have granted them "leave without loss of pay," a term it has used in other statutes. See, *e. g.*, 5 U. S. C. § 6321 (absence of veterans to attend funeral services), § 6322(a) (jury or witness duty), and § 6323 (military reserve duty) (1982 ed.). In contrast, Congress uses the terms "official

capacity" and "duty status" to indicate that an employee is "on the job" and entitled to all the usual liabilities and privileges of employment. See, *e. g.*, §§ 5751, 6322(b) (employee summoned to testify in "official capacity" entitled to travel expenses).[14]

The difficulty with respondents' argument is that Congress did not provide that employees engaged in collective bargaining are acting in their "official capacity," "on the job," or in a "duty status." Instead, the right to a salary conferred by § 7131(a) obtains only when "the employee *otherwise* would be in a duty status" (emphasis supplied). This qualifying language strongly suggests that union negotiators engaged in collective bargaining are not considered *in* a duty status and thereby entitled to all of their normal forms of compensation. Nor does the phrase "official time," borrowed from prior administrative practice, have the same meaning as "official capacity."[15] As noted above, employees on "official time" under the Executive Order regime were not generally entitled to travel expenses and a per diem allowance. See *supra*, at 100–101. Moreover, as respondents' own examples demonstrate, Congress does not rely on the mere use of the word "official" when it intends to allow travel expenses and per diems. Even as to those employees acting in an "official capacity," Congress generally provides explicit authorization for such payments. See, *e. g.*, §§ 5702, 5751(b), 6322(b). In the Civil Service Reform Act itself, for instance, Congress expressly provided that members of the Federal Service

---

[14] The Authority seemed to rely on this distinction between "duty status" and "leave" in its Interpretation when it stated that an employee negotiator "is on paid time entitled to his or her usual compensation and is not in leave status." 2 F. L. R. A., at 269.

[15] Similarly, the statement of Representative Clay that employee representatives "should be allowed official time to carry out their statutory representational activities just as management uses official time to carry out its responsibilities," 124 Cong. Rec. 29188 (1978), does not indicate that Congress intended union representatives to be treated as if they are "at work" for all purposes.

Impasses Panel are entitled to travel expenses and a per diem allowance, in addition to a salary. See §§ 5703, 7119(c)(4).[16]

Perhaps recognizing that authority for travel expenses and per diem allowances cannot be found within the four corners of § 7131(a), respondents alternatively contend that the Authority's decision is supported by the Travel Expense Act, 5 U. S. C. § 5702(a) (1982 ed.), which provides that a federal employee "traveling on official business away from his designated post of duty . . . is entitled to . . . a per diem allowance." The Travel Expense Act is administered by the Comptroller General who has concluded that agencies may authorize per diem allowances for travel that is "sufficiently in the interest of the United States so as to be regarded as official business." 44 Comp. Gen. 188, 189 (1964). Under the Executive Order regime, the Comptroller General authorized per diem payments to employee negotiators pursuant to this statute upon a certification that the employees' travel served the convenience of the employing agency. See n. 11, *supra.*

Based on its view that employee negotiators are "on the job," the Authority determined that union representatives engaged in collective bargaining are on "official business" and therefore entitled to a per diem allowance under the Travel Expense Act. 2 F. L. R. A., at 269. In support of this reasoning, the Authority notes that § 5702(a) has been construed broadly to authorize reimbursement in connection with a va-

---

[16] As further support for their reading of "official time," respondents contend that union representatives engaged in collective bargaining may be entitled to benefits under the Federal Employees' Compensation Act, 5 U. S. C. § 8101 *et seq.* (1982 ed.), and may create Government liability under the Federal Tort Claims Act, 28 U. S. C. § 1346(b) (1976 ed. and Supp. V). The fact that other federal statutes, with different purposes, may be construed to apply to employee negotiators, however, does not demonstrate that, in enacting the Civil Service Reform Act, Congress intended to treat union negotiators as engaged in official business of the Government.

riety of "quasi-official" activities, such as employees' attendance at their own personnel hearings and at privately sponsored conferences. See, e. g., Comptroller General of the United States, Travel in the Management and Operation of Federal Programs 1, App. I, p. 5 (Rpt. No. FPCD–77–11, Mar. 17, 1977); 31 Comp. Gen. 346 (1952). In each of these instances, however, the travel in question was presumably for the convenience of the agency and therefore clearly constituted "official business" of the Government. As we have explained, neither Congress' declaration that collective bargaining is in the public interest nor its use of the term of art "official time" warrants the conclusion that employee negotiators are on "official business" of the Government.[17]

## IV

In passing the Civil Service Reform Act, Congress unquestionably intended to strengthen the position of federal unions and to make the collective-bargaining process a more effective instrument of the public interest than it had been under the Executive Order regime. See supra, at 91–93. There is no evidence, however, that the Act departed from the basic assumption underlying collective bargaining in both the pub-

---

[17] Our conclusion that federal agencies may not be required under § 7131(a) to pay the travel expenses and per diem allowances of union negotiators does not, of course, preclude an agency from making such payments upon a determination that they serve the convenience of the agency or are otherwise in the primary interest of the Government, as was the practice prior to passage of the Act. See n. 11, supra. Furthermore, unions may presumably negotiate for such payments in collective bargaining as they do in the private sector. See Midstate Tel. Corp. v. NLRB, 706 F. 2d 401, 405 (CA2 1983); Axelson, Inc. v. NLRB, 599 F. 2d 91, 93–95 (CA5 1979). Indeed, we are informed that many agencies presently pay the travel expenses of employee representatives pursuant to collective-bargaining agreements. Letter from Ruth E. Peters, Counsel for Respondent FLRA, Nov. 9, 1983. See also J. P. Stevens & Co., 239 N. L. R. B. 738, 739 (1978) (employer required to pay travel expenses as remedy for failing to bargain in good faith).

lic and the private sector that the parties "proceed from contrary and to an extent antagonistic viewpoints and concepts of self-interest." *NLRB* v. *Insurance Agents*, 361 U. S. 477, 488 (1960), quoted in *General Building Contractors Assn., Inc.* v. *Pennsylvania*, 458 U. S. 375, 394 (1982). Nor did the Act confer on the FLRA an unconstrained authority to equalize the economic positions of union and management. See *American Ship Building Co.* v. *NLRB*, 380 U. S., at 316–318. We conclude, therefore, that the FLRA's interpretation of § 7131(a) constitutes an "unauthorized assumption by [the] agency of [a] major policy decisio[n] properly made by Congress." *Id.*, at 318.

The judgment of the Court of Appeals is

*Reversed.*