**FEDERAL LABOR RELATIONS
AUTHORITY, Petitioner,**

v.

**SOCIAL SECURITY
ADMINISTRATION,
Respondent.**

No. 84–1015.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 19, 1984.
Decided Jan. 29, 1985.

Jill Griffin, Atty., Federal Labor Relations Authority, Washington, D.C., with whom Ruth E. Peters, Sol., Federal Labor Relations Authority and Steven H. Svartz, Deputy Sol., Federal Labor Relations Authority, Washington, D.C., were on the brief, for petitioner. William R. Persina, Washington, D.C., entered an appearance for petitioner.

Mary Mitchell Armstrong, Atty., Dept. of Health and Human Services, Washington, D.C., for respondent. William Kanter, Atty., Dept. of Justice, Washington, D.C., also entered an appearance for respondent.

Before WALD, EDWARDS, and BORK, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

The Federal Labor Relations Authority petitions for enforcement of its order in *Social Security Administration and American Federation of Government Employees,* 11 F.L.R.A. 390 (1983). That order directed the Social Security Administration (SSA) to cease and desist from failing to negotiate in good faith with the National Office of the American Federation of Government Employees (AFGE National), the exclusive collective bargaining agent for certain SSA employees, over flexible and compressed work schedules. *Id.* at 390. The order also required the SSA to take several affirmative steps, including the reinstatement of certain terminated work schedule experiments at SSA offices if the AFGE National so requests. *See id.* at 391. The SSA attacks the order on the grounds that it is not supported by substantial evidence and is contrary to the policies of the Federal Employees Flexible and Compressed Work Schedules Act of 1982 (the 1982 Work Schedules Act), Pub.L. No. 97–221, 96 Stat. 227 (codified at 5 U.S.C. §§ 3401, 6101 & note, 6106, 6120–6133). The SSA also argues that enforcement should be denied because it has complied with the order and there is no reasonable expectation of any future violations. As we read the Authority's order in light of the facts in this case and statements by the parties to the court, the order does not require the SSA to reinstate any work schedule experiments properly terminated under section 4(b) of the 1982 Work Schedules Act, 5 U.S.C. § 6101 note. Based on that interpretation, we grant the petition for enforcement.

## I. BACKGROUND

This case involves a complicated and lengthy dispute between the AFGE National and the SSA over the use of flexible and compressed work schedules, or "flexitime," at SSA offices. The story begins with passage of the Federal Employees Flexible and Compressed Work Schedules Act of 1978 (the 1978 Work Schedules Act), Pub.L. No. 95–390, 92 Stat. 755 (codified as amended at 5 U.S.C. §§ 5550a, 6101 note). That act declared:

> The Congress finds that new trends in the usage of 4-day workweeks, flexible work hours, and other variations in workday and workweek schedules in the private sector appear to show sufficient promise to warrant carefully designed, controlled, and evaluated experimentation by Federal agencies over a 3-year period to determine whether and in what situations such varied work schedules can be successfully used by Federal agencies on a permanent basis.

*Id.* § 2. The act provided that during the three years following its enactment, federal agencies could establish work schedule experiments under the conditions described in the act. *See id.* § 4(a)(2).[1]

In March of 1979, the SSA informed various local unions of the American Federation of Government Employees that the SSA intended to conduct flexitime experiments in some of its offices.[2] The following summer, the SSA opened negotiations over flexitime with the AFGE locals that represented employees at locations selected for the experiments. However, on August 30, 1979, local AFGE units were consolidated into a national unit, AFGE National, which became the nationwide exclusive bar-

---

**1.** Congress ultimately extended the three-year duration of the act for 120 days. Act of March 26, 1982, Pub.L. No. 97–160, 96 Stat. 21.

**2.** *See* Social Sec. Admin. and American Fed'n of Gov't Employees, 11 F.L.R.A. 395, 396 (A.L.J. 1982) [hereinafter cited as ALJ Op.], *aff'd,* 11 F.L.R.A. 390 (1983) (adopting ALJ's findings, conclusions, and recommendations). Citations to the administrative law judge's opinion, which contains a much more detailed recital of the facts than is necessary here, indicate our agreement that the record material cited in that opinion supports the factual inferences drawn from the material.

gaining agent for SSA employees represented by AFGE. In September, SSA officials met with representatives of AFGE National, who expressed interest in bargaining over flexitime. Nonetheless, in September and October of 1979, the SSA executed flexitime agreements with several local AFGE representatives in the SSA's Atlanta region. *See* ALJ Op. at 397, 399–400.

The AFGE National, which was unaware of the Atlanta region agreements, reiterated its position during the following months that the SSA was required to bargain with it over flexitime experiments. *See id.* at 397–98. On December 20, 1978, an SSA official informed the AFGE National by letter that the Department of Health, Education, and Welfare (now the Department of Health and Human Services) had delegated authority to approve flexitime experiments in regional offices to the principal regional officers for the SSA, and not to the commissioner of the SSA. Accordingly, the SSA stated that it would "ensure that appropriate discussions *with the local representatives* occur prior to implementation of any experiment recommended for the organizational components identified." Letter from Herbert C. Creech to Art Johnson (Dec. 20, 1978), General Counsel's Exhibit 4, Petitioner's Appendix [hereinafter cited as Pet. A.] at 258 (emphasis added). The letter also noted that the SSA was considering flexitime experiments in the Atlanta region. *Id.* The AFGE National then filed the first of the two unfair labor practice charges at issue in this case. The charge alleged that the December 20, 1978 letter constituted an unlawful refusal to bargain. *See* General Counsel's Exhibit 1(a), Pet. A. at 251.

Between January 3 and February 1, 1980, the SSA negotiated, signed, and implemented a number of flexitime agreements with local union representatives. *See* ALJ Op. at 400. Further communications between the AFGE National and the SSA resulted in a meeting during March of 1980, at which the SSA disclosed to the AFGE National for the first time that the SSA had already put numerous flexitime agreements with local unions into effect. In light of this discovery and the pending unfair labor practice complaint, the AFGE National did not offer any bargaining proposals concerning flexitime at the meeting. *See id.* at 401. Eventually, the SSA settled the complaint by agreeing that it would not change work schedules through flexitime programs without giving the AFGE National an opportunity to bargain over the issue and that it would not engage in certain other specified practices. *See* Joint Exhibit 1, Pet. A. at 205.

The AFGE National wrote further letters to the SSA demanding bargaining over flexitime on October 8, 1980; December 4, 1980; and February 2, 1981. The SSA did not answer these letters. Finally, a fourth letter dated March 23, 1981 produced a meeting on April 9, 1981, at which the SSA apparently told the AFGE National representatives that the flexitime programs were not "working out," and that the SSA would "get back" to the union representatives on the issue. On April 15, the AFGE National submitted flexitime proposals to the SSA, and on May 11, the AFGE National again demanded immediate negotiations. The SSA did not respond. *See* ALJ Op. at 402–04, 410. On July 6, 1981, the AFGE National filed a second unfair labor practice charge, which claimed that the SSA had refused to bargain in violation of the settlement agreement covering the earlier unfair labor practice charge. *See* General Counsel's Exhibit 1(e), Pet. A. at 242. On July 13, the SSA informed the AFGE National that unless agreements with local unions required otherwise, the SSA would end all flexitime experiments on August 15, 1981. *See* ALJ Op. at 410.

After further skirmishes between the SSA and the AFGE National, the Authority withdrew its approval of the settlement agreement in the first unfair labor practice charge. The General Counsel then consolidated the two charges and issued a complaint in both. *See* General Counsel's Exhibit 1(g), Pet. A. at 235. The administrative law judge found that the SSA had committed unfair labor practices in both of

the consolidated cases. He consequently proposed that the Authority order the SSA to cease and desist from failing to bargain in good faith over flexitime, and to take certain other remedial measures. *See* ALJ Op. at 412–14. The Authority adopted the findings and conclusions of the administrative law judge and issued the proposed order. *Social Sec. Admin. and American Fed'n of Gov't Employees,* 11 F.L.R.A. 390 (1983). The Authority now petitions for enforcement.

## II. THE SUBSTANTIAL EVIDENCE CHALLENGE

The Federal Labor Relations Authority is charged with the administration of section 701 of the Civil Service Reform Act of 1978, Pub.L. No. 95–454, 92 Stat. 1101, 1191 (codified at 5 U.S.C. §§ 7101–7135), which comprehensively regulates labor relations between the federal government and its employees. *See Bureau of Alcohol, Tobacco, and Firearms v. Federal Labor Relations Auth.,* 464 U.S. 89, 104 S.Ct. 439, 441–42, 78 L.Ed.2d 195 (1983). The Authority may petition an appropriate court of appeals for enforcement of its orders. 5 U.S.C. § 7123(b). We review such a petition under the standards of section 10(e) of the Administrative Procedure Act, 5 U.S.C. § 706. *See* 5 U.S.C. § 7123(c).

■ The SSA maintains that the Authority's order is not "supported by substantial evidence on the record considered as a whole," 5 U.S.C. § 7123(c); *see also* 5 U.S.C. § 706(2)(E), and therefore should not be enforced. We have thoroughly reviewed the SSA's objections to the Authority's factfinding. We believe those objections are fully answered in the carefully prepared opinion of the Authority's administrative law judge, and we therefore uphold the Authority's determination that the SSA committed the unfair labor practices charged.

## III. THE EFFECT OF THE 1982 WORK SCHEDULES ACT

The SSA's major argument against enforcement is that the Authority's order is contrary to the policies of the 1982 Work Schedules Act. That act was based upon congressional findings that under the experimental programs authorized by the 1978 Work Schedules Act, "[t]he benefits of [flexible and compressed work] schedules to employees were overwhelming" and "[t]he benefits of these schedules to government, when utilized in a proper fashion, were also significant." S.Rep. No. 365, 97th Cong., 2d Sess. 4 (1982), *reprinted in* 1982 U.S.Code Cong. & Ad.News at 565, 566. However, Congress also found that "improper use of alternative work schedules did have some serious repercussions," including diminished productivity and work performance and increased costs. *Id.*

The 1982 Work Schedules Act reflects Congress' decision to authorize the use of permanent flexitime programs in government agencies, *see* 1982 Work Schedules Act § 2(a)(2), 5 U.S.C. §§ 6122, 6127, but to establish safeguards insuring that these programs will not compromise prudent and efficient management. The act also expressly declares that flexitime is a wholly appropriate subject for collective bargaining:

> In the case of employees in a unit represented by an exclusive representative, any flexible or compressed work schedule, and the establishment and termination of any such schedule, shall be subject to the terms of a collective bargaining agreement between the agency and the exclusive representative.

*Id.* § 6130(a)(1). Similarly, the Senate Report asserts that the act contemplates "full negotiation on all aspects of an alternative work schedule." S.Rep. No. 365, 97th Cong., 2d Sess. 5 (1982), *reprinted in* 1982 U.S.Code Cong. & Ad.News at 565, 567.

However, the act also provides that if the head of an agency finds that a proposed or established flexitime program has had, or would have, "adverse agency impact," the agency shall determine not to establish or continue the program in question. *See* 1982 Work Schedules Act § 2(a)(2), 5 U.S.C. § 6131(a). The act defines "adverse agency impact" as:

(1) a reduction of the productivity of the agency;

(2) a diminished level of services furnished to the public by the agency; or

(3) an increase in the cost of agency operations (other than a reasonable administrative cost relating to the process of establishing a flexible or compressed schedule).

*Id.* § 6131(b)(1)–(3). If the head of an agency finds that a flexitime program mandated by a collective bargaining agreement has adverse agency impact, the agency may reopen the agreement to seek termination of the program. *Id.* § 6131(c)(3)(A). Should the agency and the exclusive representative reach a bargaining impasse over an agency determination not to establish or continue a flexitime program due to adverse agency impact, the act provides that the dispute shall be referred to the Federal Service Impasses Panel. *Id.* § 6131(c)(2)(A), (3)(B). If the Panel finds that the agency's determination is "supported by evidence," *id.* § 6131(c)(2)(B), (3)(C), the agency may decline to establish or continue the program. Finally, section 4 of the act provides in part that:

(a) Except as provided in subsection (b), each flexible or compressed work schedule established by any agency under the Federal Employees Flexible and Compressed Work Schedules Act of 1978 ... in existence on the date of the enactment of this Act shall be continued by the agency concerned.

(b)(1) During the 90-day period after the date of the enactment of this Act [July 23, 1982], any flexible or compressed work schedules referred to in subsection (a) may be reviewed by the agency concerned. If, in reviewing the schedule, the agency determines in writing that—

(A) the schedule has reduced the productivity of the agency or the level of

services to the public, or has increased the cost of the agency operations, and

(B) termination of the schedule will not result in an increase in the cost of the agency operations (other than a reasonable administrative cost relating to the process of terminating a schedule),

the agency shall, notwithstanding any provision of a negotiated agreement, immediately terminate such schedule and such termination shall not be subject to negotiation or to administrative review (except as the President may provide) or to judicial review.

5 U.S.C. § 6101 note.

The SSA points out that on October 21, 1982, it decided to terminate unilaterally all remaining Atlanta region flexitime programs under section 4(b). *See* Brief for the Respondent, Addendum B. It further notes that even assuming its previous termination of other flexitime programs was unlawful, the SSA would have been able to terminate those programs as well during the ninety-day period specified in section 4(b). Thus, requiring the SSA to reinstate experimental programs established under the 1978 Work Schedules Act would supposedly frustrate the SSA's statutory right under the 1982 Work Schedules Act to have ended those experimental programs without administrative or judicial review.[3]

█ The first obstacle to this theory is 5 U.S.C. § 7123(c), which prohibits us from considering any objection to enforcement that was not urged before the Authority. The SSA argues that the General Counsel raised this issue before the administrative law judge, and that the Authority was therefore on notice of the question. In fact, however, the hearing before the administrative law judge took place on December 16, 1981—well before passage of the 1982 Work Schedules Act in July of

---

**3.** Paragraph 2(c) of the Authority's order directs the SSA to:

Upon request of the [AFGE National], the employees' exclusive collective bargaining representative, reinstitute, to the extent consonant with law and regulations, any or all

work schedule experiments terminated after August 30, 1979 without such termination having been negotiated with the [AFGE National].

Social Sec. Admin. and American Fed'n of Gov't Employees, 11 F.L.R.A. 390, 391 (1983).

1982. At the hearing, the administrative law judge simply asked the General Counsel what remedy would be appropriate if Congress allowed the authorization for flexitime programs to expire in 1982. After a brief colloquy, the administrative law judge and the General Counsel agreed that in that event, the appropriate remedy would be a posted cease and desist order. *See* Transcript at 197, Pet. A. at 196. We do not consider these speculative comments sufficient to raise the SSA's present objection.

The administrative law judge rendered his decision on May 12, 1982. The SSA's brief in support of its exceptions to that decision was dated June 11, 1982. *See* Pet. A. at 467, 476. On July 23, 1982, the President signed the 1982 Work Schedules Act into law. The Authority issued its decision on February 18, 1983. Thus, during nearly seven months between passage of the 1982 act and the Authority's decision, the SSA did not, so far as the record reveals, attempt to file supplemental briefs calling attention to the act or in any other way alert the Authority to its argument based on the act. Nor did it raise the argument in a motion for reconsideration before the Authority, although the Authority's rules expressly permit such motions. *See* 5 C.F.R. § 2429.17 (1984). Under these circumstances, we think that the SSA had ample opportunity to inform the Authority of its argument, and that passage of the act after the initial administrative hearing cannot excuse the SSA's failure to do so.

If the SSA had produced some reasonable explanation for its failure to raise the issue before the agency, or, perhaps, if special circumstances counseled against decision of the case without considering the issue, we might conceivably remand the case to the Authority for reconsideration in light of the new argument. *Cf. Department of the Treasury v. Federal Labor Relations Auth.,* 707 F.2d 574, 579–81 (D.C.Cir.1983). But we discern no such circumstances here. To the extent that the SSA resists the possible reinstatement of flexitime programs terminated before the 1982 act became effective, the SSA's argu-

ment rests on a series of nebulous, counterfactual assumptions. Had the SSA not terminated the flexitime experiments unlawfully, and had it made the requisite findings with respect to those experiments under section 4(b) within the ninety-day period, the SSA would indeed have escaped review of its termination decisions. But these things did not happen. Thus, the SSA must argue that despite the broad discretion Congress granted to the Authority in fixing remedies, *see* 5 U.S.C. § 7105(g)(3), the circumscribed ninety-day provision of section 4(b) implicitly stripped the Authority of the power to order reinstatement of flexitime experiments the SSA unlawfully terminated before passage of the 1982 act.

We note, however, that in section 4(a) of the 1982 Work Schedules Act Congress declared that unless an agency actually made the appropriate findings within the stated period, the agency was to continue any flexible or compressed work schedules in existence when the act was passed. Congress clearly expected that these continued programs, like proposals for new flexitime programs, would be subject to collective bargaining. We also note that if the AFGE National does request reinstatement of unlawfully terminated programs, the SSA will be free to find that the reinstated programs will have "adverse agency impact." If bargaining over the SSA's efforts to terminate some or all of the reinstated programs then fails, the SSA may take the dispute to the Federal Service Impasses Panel. Should the Panel uphold the finding of adverse agency impact, the SSA may end the reinstated flexitime programs regardless of the position taken by the AFGE National. Thus, the real harm of which the SSA complains amounts to only (1) the obligation to reinstate unlawfully terminated programs pending administrative review of any finding of adverse agency impact the SSA may make; and (2) loss of the opportunity to terminate the programs, without prior bargaining, based on the SSA's *unreviewable* finding that the programs compromised agency perform-

ance.[4] While we do not decide the merits of the SSA's position on this issue, we do hold that the Authority's order is not at variance with the governing statutes in a way that might arguably support remand, despite the SSA's failure to present its views to the Authority.

If the Authority's order required the SSA to reinstate, at the AFGE National's election, flexitime programs that were actually in existence when the 1982 Work Schedules Act became effective and that the SSA had properly terminated under section 4(b), the SSA's argument would be much more formidable. The SSA could then plausibly claim that section 4(b) was intended to foreclose administrative or judicial review of such terminations, and that the Authority should not be allowed to nullify indirectly agency decisions that Congress has denied the Authority power to review. In this event, there might be some force to the argument that we should excuse the SSA's failure to raise the issue before the agency. However, the SSA's and the Authority's submissions to this court suggest that they both view paragraph 2(c) of the Authority's order as limited to reinstatement of programs improperly terminated without bargaining.[5] Moreover, although the Authority issued its order after the SSA terminated certain flexitime programs under section 4(b), its decision and order were based upon the record of the proceedings before the administrative law judge and the administrative law judge's conclusions. Since the administrative law judge's decision was reached prior to passage of the 1982 Work Schedules Act, nothing before the Authority when it decided this case drew into question the propriety of any flexitime program termi-

nations under section 4(b). We therefore assume the order was not intended to undo SSA decisions that no one has challenged as unlawful.

## IV. The SSA's Alleged Compliance With the Order

 Finally, the SSA argues that enforcement should be refused because the Authority has not shown any likelihood of continuing or future violations by the SSA. The SSA frames this argument in two ways. First, it claims that its misconduct resulted from confusion over its obligation to bargain with the AFGE National, rather than with local unions. Since that confusion has been dispelled, "[i]t is unlikely that SSA would or could again be charged with negotiating with the wrong level of the AFGE." Brief for Respondent at 20. On the SSA's view, enforcement should therefore be refused. Second, the SSA claims that a regulation of the Authority forbids it from seeking enforcement of an order without finding that the party against whom enforcement is sought has failed to comply with the order. We reject both arguments.

In *Federal Labor Relations Authority v. United States Department of the Air Force*, 735 F.2d 1513 (D.C.Cir.1984), this court squarely held that an agency's compliance with an order by the Authority does not prevent the Authority from seeking enforcement. We explained that:

It is well settled in the context of labor relations that "the employer's compliance with an order of the Board does not render [an enforcement proceeding] moot...." *NLRB v. Raytheon Co.*, 398 U.S. 25, 27 [90 S.Ct. 1547, 1548, 26 L.Ed.2d 21] (1970) (quoting *NLRB v. Mexia Textile Mills, Inc.*, 339 U.S. 563, 567

---

**4.** Although the wording of the two sections is not identical, substantially the same findings that would have permitted the SSA to terminate a flexitime program under section 4(b) will enable it to determine that the program has adverse agency impact under section 2(a)(2), 5 U.S.C. § 6131(b)(1)–(3). Thus, the SSA will be allowed to terminate any reinstated flexitime programs for the same reasons that would have allowed termination under the ninety-day provision of the 1982 act.

**5.** The Authority's Supplemental Memorandum to the Court, submitted in response to a request from the bench at oral argument, states that paragraph 2(c) of the Authority's order "requires SSA, upon the request of [AFGE National], to reinstitute the work schedules that SSA *improperly* terminated." *Id.* at 1 (emphasis added); *see also* Declaration of Peter D. Spencer ¶ 7, Respondent's Supplemental Briefing.

[70 S.Ct. 826, 828, 94 L.Ed. 1067] (1950)). The rationale for this rule is that cease and desist orders generally impose on employers a continuing obligation to refrain from violations of employees' rights. An enforcement decree ensures against future resumption of the unfair labor practice.

*Id.* at 1515–16 (footnote omitted). The Authority found that the SSA persisted in its unlawful conduct well after it should have understood that it was required to bargain with the AFGE National. *See* ALJ Op. at 409–10. We cannot say that the likelihood of any future refusals to bargain is so marginal as to make enforcement inappropriate. *See Department of the Air Force,* 735 F.2d at 1516 n. 7.

The regulation on which the SSA relies provides that:

> When remedial action is ordered, the respondent shall report to the appropriate Regional Director within a specified period that the required remedial action has been effected. When the General Counsel finds that the required remedial action has not been effected, the General Counsel shall take such action as may be appropriate, including referral to the Authority for enforcement.

5 C.F.R. § 2423.30 (1984). By its terms, the regulation simply authorizes the General Counsel to recommend enforcement if he determines that an order has been disobeyed. It does not state that in no other circumstance may the General Counsel recommend that the Authority seek enforcement, and it does not explicitly restrict the Authority, which has the statutory power to petition for enforcement, *see* 5 U.S.C. § 7123(b), at all. We are unwilling to infer on such slender evidence that the Authority has bound itself not to seek enforcement of any order unless the General Counsel so recommends, and has bound the General Counsel not to recommend enforcement absent a finding of noncompliance. We therefore cannot agree that the Authority failed to follow its regulation.

CONCLUSION

We interpret the Authority's order not to require the SSA to reinstate, at the election of the AFGE National, flexitime programs terminated during the ninety-day period established by section 4(b) of the 1982 Work Schedules Act. The petition of the Authority for enforcement of its order, as so interpreted, is

*Granted.*