NATIONAL FUEL GAS SUPPLY
CORPORATION, Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Pennsylvania Office of Consumer Advocate, Pennsylvania Public Utility Commission, Public Service Electric & Gas Co., Public Service Commission of the State of New York, Intervenors.

PUBLIC SERVICE COMMISSION OF
the STATE OF NEW YORK,
Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Pennsylvania Public Utility Commission, Public Service Electric & Gas Co., Consolidated Edison Co. of New York, National Fuel Gas Supply Corp., Intervenors.

NATIONAL FUEL GAS SUPPLY
CORPORATION, Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Public Service Commission of the State of New York, Public Service Electric & Gas Co., Laclede Gas Company, Intervenors.

NATIONAL FUEL GAS SUPPLY
CORPORATION, Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Pennsylvania Office of Consumer Advocate, Pennsylvania Public Utility Commission, Intervenors.

Nos. 89–1025, 89–1043, 89–1352
and 90–1015.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 8, 1990.

Decided April 10, 1990.

George L. Weber, with whom Kenneth L. Glick was on the brief, for petitioner National Fuel Gas Supply Corp. in 89–1025, 89–1352, and 90–1015 and intervenor in 89–1043.

David D'Alessandro, with whom Richard A. Solomon, New York City, was on the brief, for petitioner Public Service Com'n of the State of N.Y. in 89–1043 and intervenor in 89–1025 and 89–1352.

Joel M. Cockrell, Atty., F.E.R.C., with whom William S. Scherman, Gen. Counsel, Jerome M. Feit, Solicitor, and Joseph S. Davies, Deputy Sol., F.E.R.C., Washington, D.C., were on the brief, for respondent in all cases.

Philip F. McClelland, Westfield, N.Y., was on the brief for intervenor Pennsylvania Office of Consumer Advocate in 89–1025 and 90–1015.

Lawrence F. Barth, Philadelphia, Pa., Veronica A. Smith and John F. Povilaitis, Harrisburg, Pa., entered appearances for intervenor Pennsylvania Public Utility Com'n in 89–1025, 89–1043 and 90–1015.

James R. Lacey, Newark, N.J., entered an appearance for intervenor Public Service Electric & Gas Co. in 89–1025, 89–1043 and 89–1352.

William I. Harkaway, Harvey L. Reiter, Washington, D.C. and Barbara M. Gunther, New York City, entered appearances for intervenor Consolidated Edison Co. of New York, Inc. in 89–1043.

Kenneth J. Neises, Washington, D.C., entered an appearance for intervenor Laclede Gas Co. in 89–1352.

Before RUTH BADER GINSBURG, SILBERMAN and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

National Fuel Gas Supply Corporation ("National") and the Public Service Commission of the State of New York ("New York") petition this Court for review of several orders of the Federal Energy Regulatory Commission ("FERC" or "the Commission") regarding certain National purchased gas adjustment filings. New York argues that the Commission erred in concluding that National's payment of certain gathering costs to local gas producers was not abusive. National argues that the Commission erred in finding that certain purchases of gas for off-system sales were imprudent. As we find that the Commission did not abuse its discretion in either determination, we deny both petitions and affirm the Commission's decisions.

## I. REGULATORY FRAMEWORK

The Commission regulates the sale and transportation of natural gas in interstate commerce under authority granted in the Natural Gas Act ("NGA"), 15 U.S.C. §§ 717 et seq., and the Natural Gas Policy Act ("NGPA"), 15 U.S.C. §§ 3301 et seq. The relevant regulatory framework is laid out in some detail in *Office of Consumers' Counsel v. FERC*, 783 F.2d 206, 212–14 (D.C.Cir.1986) [hereinafter *OCC*]. We only briefly review the relevant statutes here.

Under section 4 of the NGA, rates are unlawful if they are not "just and reasonable." 15 U.S.C. § 717c(a). When determining whether a rate is just and reasonable, the Commission has traditionally allowed a pipeline's rates to reflect its prudently incurred costs plus a reasonable return on investment. *OCC*, 783 F.2d at 212–13. Section 4 of the NGA, 15 U.S.C. § 717c(d), provides that all changes in rates must be presented to the Commission, which can hold hearings on its own initiative or in response to complaints in order to determine the lawfulness of requested rate changes. *Id.* § 717c(e). The pipeline bears the burden of showing that an increased rate or charge is just and reasonable. *Id.* Rather than going through the full-scale section 4 review to adjust their rates for

changes in the cost of purchasing gas, some interstate pipelines may submit purchased gas adjustment ("PGA") filings on a regular basis to adjust their rates for increases or decreases in the cost of the gas they purchase. 18 C.F.R. § 154.38(d) (1985). In exchange, these pipelines must agree to submit all costs and revenues to a full-scale section 4 review at least once every three years. *Id.* § 154.38(d)(4)(vi).

When it enacted the NGPA in 1978, Congress partially deregulated the wellhead prices that producers could charge for gas. Under section 601 of the NGPA, any amount paid by an interstate pipeline for a wellhead purchase is deemed just and reasonable if the category of gas is deregulated or if the price does not exceed the maximum lawful price established by the NGPA. 15 U.S.C. § 3431(b). The Commission may not deny recovery of a pipeline's costs for purchasing gas which are deemed just and reasonable under this statute "except to the extent the Commission determines that the amount paid was excessive due to fraud, abuse, or similar grounds." *Id.* § 3431(c)(2).

## II. PROCEEDINGS BEFORE THE COMMISSION

National submitted its regularly scheduled PGA filings on December 31, 1984, and June 28, 1985. The Commission consolidated its consideration of these filings and set the matter for hearing to evaluate several of National's gas purchasing practices. In the Initial Decision, the Administrative Law Judge ("ALJ") found that National's payment of gathering allowances to certain local producers violated section 601(c)(2) of the NGPA, 15 U.S.C. § 3431(c)(2). *National Fuel Gas Supply Corporation,* 34 F.E.R.C. ¶ 63,077, at 65,-243, 65,244–45 (1986) [hereinafter *Initial Decision* ]. The ALJ also concluded that certain National purchases of gas for off-system sales were imprudent under section 4 of the NGA and ordered National to refund to its on-system customers the excess monies. *Id.,* at 65,245–47.

The Commission reversed the ALJ with respect to National's payment of gathering charges in connection with its purchases of local production and concluded that these payments were not excessive and did not constitute fraud or abuse within the meaning of section 601(c)(2) of the NGPA. *National Fuel Gas Supply Corporation,* 44 F.E.R.C. ¶ 61,293, at 62,050, 62,051–54 (1988) [hereinafter *Opinion No. 315* ]. The Commission also concluded that the ALJ was correct in finding that certain of National's purchases of gas for resale off-system were imprudent under section 4 of the NGA and ordered National to refund to its on-system customers the difference between the 1984 purchased gas costs and the gas cost recovery ("GCR") revenues attributable to the off-system sales. *Id.,* at 62,054–57. In its order denying rehearing, *National Fuel Gas Supply Corporation,* 45 F.E.R.C. ¶ 61,269, at 61,837, 61,845–46 (1988) [hereinafter *Opinion No. 315–A* ], the Commission ordered National to make refunds to its customers not only based on its 1984 purchases of gas for off-system sales, but for such purchases subsequent to 1984. The Commission defended its expansion of the refund order and rejected various other National claims in a second order denying rehearing. *National Fuel Gas Supply Corporation,* 46 F.E.R.C. ¶ 61,375, at 62,169 (1989) [hereinafter *Opinion No. 315–B* ].

As we noted above, the petitions before this Court raise two different sets of issues. First, whether the Commission erred in concluding that National's payments of gathering allowances to certain local gas producers were neither excessive nor abusive. Second, whether the Commission erred in concluding that certain purchases of gas for off-system sales were imprudent and that National should make refunds to its on-system customers to the extent that these costs were excessive. We consider each set of issues in turn.

## III. GATHERING COSTS

▮ The Commission cannot deny a pipeline recovery of gas acquisition costs governed by section 601(c)(2) of the NGPA unless the amounts paid for the gas were both excessive and either abusive or fraudulent. 15 U.S.C. § 3431(c)(2). *See also*

*OCC*, 783 F.2d at 222–23. In the PGA filings at issue National sought to recover certain gathering costs paid to local producers. The ALJ found that National had paid local producers a base price equal to its pipeline suppliers' commodity rate for discretionary purchases *plus* an additional gathering allowance of up to 25 cents per MMBtu. *Initial Decision*, 34 F.E.R.C. at 65,244. The ALJ noted that one of National's principal pipeline suppliers had gas supplies available for sale at prices equivalent to the base prices paid to the various local gas producers, not including the gathering allowances. *Id.* The ALJ thus found that National's payments of gathering charges to the local producers were abusive and excessive and that therefore National should not be allowed to recover the costs in light of section 601(c)(2). The Commission reversed the ALJ on this issue and found that the gathering costs were neither abusive nor excessive. New York petitions for review of this determination. We uphold the Commission's conclusions.

## A. Excessive Costs

In order to decide whether the payments for gathering allowances were excessive, the Commission examined the effect of the payments on National's weighted average cost of gas ("WACOG"). *Opinion No. 315*, 44 F.E.R.C. at 62,052–53. In other words, the Commission rolled the gathering allowances in with National's other gas acquisition costs to determine whether the gathering allowances significantly impacted National's overall gas costs. The Commission found that the impact of the gathering allowances on National's WACOG was less than $.01 per MMBtu, and concluded that because the impact of the allowances on National's WACOG was so small, the payments could not be deemed "excessive" for the purposes of section 601(c)(2). *Id.* at 62,053–54.

New York contends that the Commission erred by focusing on the effect of the payments on National's WACOG in determining whether the costs were excessive. New York relies on this Court's decision in *OCC*, where we rejected a "significant adverse effect" on customers as a prerequisite for a finding of "abuse" for section 601(c)(2) purposes. *OCC*, 783 F.2d at 222–23. According to New York, the Commission effectively adopted the same "significant adverse effect" test in this proceeding, but the Commission used the test to determine whether National made "excessive" payments, rather than to determine whether an excessive payment was due to "abuse" or "similar grounds." New York argues that the Commission thereby attempted to circumvent our *OCC* decision.

■ We hold that the Commission acted within its discretion by looking at the effect of the gathering allowance payments on National's WACOG in evaluating whether the payments were "excessive." We note as an initial matter that we owe FERC deference with respect to its construction of section 601(c). *OCC*, 783 F.2d at 218. Although this Court should not rubberstamp an administrative decision that is inconsistent with a statutory mandate or underlying congressional policy, *Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983) (quoting *NLRB v. Brown*, 380 U.S. 278, 291, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965)), if Congress has not spoken clearly on the question at issue this Court should defer to the agency's construction of the statute as long as it is permissible. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984).

■ We conclude that Congress has not implicitly or explicitly defined "excessive" for the purposes of section 601(c)(2), but has left the task of defining the term to FERC. This conclusion is in no way inconsistent with our holding in the *OCC* case. In *OCC* we held that the "abuse" prong of section 601(c)(2) plainly does not include a "significant adverse effect" requirement. 783 F.2d at 222. Part of the rationale underlying our conclusion was that an "effects" test was already built into the statute under the "excessive payment" prong. *Id.* That is, in the event of reckless or abusive conduct an "excessive payment" is

required to trigger the statute. We did not define "excessive payment" in the *OCC* case, but left to the Commission "the task of fleshing out the excessive payment requirement to deal with the practicalities of the marketplace." *Id.* at 223.

The WACOG test that the Commission has applied in this case is not the significant adverse consequences test we rejected in the *OCC* case. In this proceeding the Commission adopted the WACOG test not as a means for determining whether or not the disputed purchases significantly affected National's customers but, rather, as a simple way to determine whether the given purchases were sufficiently aberrant to warrant further investigation. That is, the Commission employed the WACOG test in this case not in order to determine whether consumers were adversely affected by the payments but to determine whether the payments were truly "excessive." Because we explicitly left the Commission with the discretion to develop a test for determining whether payments are "excessive," and because the test that the Commission developed is different from the test which we rejected in *OCC*, the Commission's use of a WACOG test in the proceeding below was certainly not foreclosed by our *OCC* decision.

The Commission's construction of "excessive" is thus due deference from this Court as long as it is a reasonable construction. We conclude that it is. The Commission could reasonably conclude that those abusive payments which have little effect on a pipeline's WACOG are not sufficiently aberrant to trigger section 601(c)(2), while those that significantly alter the pipeline's WACOG are sufficiently excessive to warrant examination to determine if they are due to "fraud, abuse, or similar grounds" and therefore should not be recovered through the PGA. The Commission can legitimately take into account its administrative burdens when defining an ambiguous term such as "excessive." *See Women Involved in Farm Economics v. U.S. Dep't of Agric.*, 876 F.2d 994, 1001–02 (D.C.Cir.1989), *cert. denied sub nom. Women Involved in Farm Economics v. Yuetter*, — U.S. —, 110 S.Ct. 717, 107

L.Ed.2d 737 (1990); *Drummond Coal Co. v. Hodel*, 796 F.2d 503, 507 (D.C.Cir.1986), *cert. denied*, 480 U.S. 941, 107 S.Ct. 1593, 94 L.Ed.2d 782 (1987). We therefore uphold the Commission's construction of the term "excessive" in section 601(c)(2).

*B. Abusive Payments*

In addition to concluding that National's payments of gathering allowances to local producers were not excessive, the Commission also found that these payments were not abusive. *Opinion No. 315*, 44 F.E.R.C. at 62,053. The Commission reasoned that gathering allowances may have been necessary for National to diversify its supplies by obtaining a reliable long term source of gas close to its service area. *Id.* Although the Commission found the record inconclusive regarding whether or not the gathering allowances were necessary in order to obtain a long term source of supply, the Commission concluded that New York had failed to show that National's practice of paying the allowances was abusive. *Id.*

New York argues that the Commission improperly placed on New York the burden of showing that payment of the gathering costs was *not* necessary to obtain adequate long term supplies. By showing that National paid more for the locally produced gas than it would have paid for the available gas from its traditional suppliers, New York claims that it made a *prima facie* showing that the disputed purchases were abusive. New York argues that the burden then shifted to National to show that the payments were necessary to obtain adequate long term supplies. Further, New York argues that regardless of who bore the burden on the issue of the propriety of the disputed purchases, the Commission's conclusion that the payments of gathering allowances were not abusive is not supported by substantial evidence.

■ We hold that the Commission did not improperly allocate to New York the burden of showing that the payments were not necessary and that the Commission's conclusion that the payments were not abusive is supported by substantial evidence.

The Commission has defined "abusive," for section 601(c)(2) purposes, as exhibiting "reckless disregard" of the pipeline's duty to obtain gas for its customers at the lowest rate consistent with maintaining adequate service. *OCC,* 783 F.2d at 218. There is no question that the challenger, in this case New York, ultimately bears the burden of showing the pipeline's purchasing practices to be abusive or reckless. *Id.* at 231 n. 46. We seriously doubt that New York's showing that National paid more for its gas than it would have had National bought the gas from its traditional suppliers sufficed to shift any sort of burden to National. National has a duty to minimize its overall costs to achieve the lowest reasonable rates consistent with the maintenance of adequate long term service. It does not, then, have a blanket duty to absolutely minimize its costs, irrespective of other considerations. New York may have showed that National did not minimize its costs, but this does not mean that New York showed that National failed to incur the lowest reasonable costs *consistent with the maintenance of adequate long term service.* In order to make out even a *prima facie* case, then, New York had to make some showing that the costs incurred by National were not necessary to obtain sufficient long term supplies.

Moreover, even if the burden did shift to National to go forward with some evidence that the payments were in fact necessary to the fulfillment of National's duties, National did offer evidence that the payments were necessary, and New York was left, as it began, bearing the ultimate burden. National offered testimony that it deemed the gathering cost payments necessary to ensure its long term supplies. This testimony was enough to put New York on notice as to the nature of National's claimed justifications. The Commission thus properly left New York with the burden of showing that this justification was invalid.

■ Finally, we hold that in light of the Commission's proper allocation of the burden of proof on this issue, its conclusion was supported by substantial evidence. We must defer to the Commission's exper-tise, particularly where the statute prescribes few specific standards for the Commission to follow, as long as the Commission's decision is supported by "substantial evidence" on the record and is reached by "reasoned decisionmaking." *Electricity Consumers Resource Council v. FERC,* 747 F.2d 1511, 1513 (D.C.Cir.1984) (citing *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962)). In this case, New York bore the burden of showing that National's payments of the gathering costs were abusive. The Commission's conclusion that New York failed to satisfy this burden does not necessarily need to be supported by substantial evidence that the payments were, in fact, necessary. That is, if no evidence had been offered on either side, the Commission could have reached the same conclusion. In this case New York's evidence that the payments were unnecessary was inconclusive. Although New York claimed to offer evidence that at least one of the local producers was capable of raising capital even without the gathering allowances, the value of that evidence was disputed. More importantly, New York offered no evidence concerning the numerous other local producers to which National paid gathering allowances.

National also offered some affirmative evidence which supports the Commission's conclusion. National offered testimony that it believed the payments were necessary to encourage continued development of a reliable and convenient long term source of gas, and National presented some evidence that in light of certain physical characteristics of the local gas wells, the gathering costs were necessary to get the gas to National. We thus conclude that the Commission's determination that National's payments of gathering costs to local producers were not abusive is supported by substantial record evidence.

### IV. PURCHASES FOR OFF-SYSTEM SALES

■ The second set of purchases at issue in this case are purchases of gas for resale off-system, i.e., to customers not directly hooked into National's system and to whom

the gas is transported through other pipelines. The Commission previously approved these off-system sales in various certificate proceedings under section 7 of the NGA. *See, for example, National Fuel Gas Supply Corporation,* 24 F.E. R.C. ¶ 61,294, at 61,608 (1983) [hereinafter *Certification Proceeding*]. In those proceedings, the Commission determined that the rate under National's Rate Schedule I–1 was the proper selling price for the gas sold off-system. *Id.* at 61,608–10. The Commission found this rate to be appropriate because at a different rate the sale might not be consummated and National's on-system customers would lose the benefits of the allocation of some of their fixed costs to the off-system sales and the reduction in their risk of minimum bill liability. *Id.* at 61,609. When it authorized the sales under section 7 of the NGA, the Commission explicitly noted that National's on-system customers would benefit as a result of the sales rather than bear additional costs. National represented to the Commission in this proceeding that it would purchase the incremental gas required for the off-system sales from its cheapest suppliers. *Id.* On the occasions at issue here, National did not do so, but instead bought the gas from a more expensive supplier. The Pennsylvania Office of Consumer Advocate ("Pennsylvania") opposed National's PGA filings in this case arguing that the cost of gas purchased for these off-system sales should not be fully passed through because some of the purchases were not prudent.

The Commission reviewed the purchases to determine whether the amounts paid were just and reasonable under section 4 of the NGA. FERC applied the "reasonable utility management" standard which the Commission had adopted in *New England Power Company,* 31 F.E.R.C. ¶ 61,047, at 61,084 (1985), *affirmed sub nom. Violet v. FERC,* 800 F.2d 280 (1st Cir.1986), in order to determine whether the purchases were prudent. *Opinion No. 315,* 44 F.E.R.C. at 62,055. Relying primarily on Exhibit No. 14, the Commission compared the cost of the gas purchased for off-system sales in 1984 with the GCR revenues from those sales. Because National's off-system sales

resulted in an approximately $1.3 million net detriment to the pipeline's on-system customers in 1984, and because the purchases and off-system sales did not yield sufficient other benefits to on-system customers to offset that detriment, the Commission concluded that the purchases for the 1984 off-system sales were imprudent. *Id.* at 62,055–56. The Commission thus ordered National to refund to its on-system customers the excess monies that National had passed on through its PGA. *Id.* at 62,057. In its denial of rehearing the Commission affirmed its initial conclusions and ordered National to refund to its on-system customers not just the improperly passed through gas acquisition costs for the 1984 off-system sales, but also the excess costs improperly passed through subsequent to 1984. *Opinion No. 315–A,* 45 F.E.R.C. at 61,845–46.

National raises two general sets of arguments before this Court. First, National argues that the Commission's method for determining whether the purchases of gas for off-system sales were prudent was arbitrary. Second, National argues that the Commission committed a number of errors in applying this test. We find that the Commission's method for evaluating the prudence of National's purchases and its application of that method were not arbitrary or capricious.

*A.  The Commission's Standard for Determining Prudence*

■ In *Opinion No. 315* the Commission stated that prudence was ascertained with reference to what a reasonable utility management would do, in good faith, in the same circumstances, and at the relevant point in time. 44 F.E.R.C. at 62,055. The Commission noted that "while in hindsight it may be clear that a management decision was wrong," its task was to review the prudence of a utility's actions and the costs resulting therefrom based on the particular circumstances existing either at the time the challenged costs were actually incurred, or the time the utility became committed to incur those expenses. *Id.,* quoting *New England Power Company,* 31

F.E.R.C. at 61,084. National claims that the Commission ignored its own standard and applied a backward-looking analysis in evaluating the prudence of National's purchases. National further argues that rather than actually employing the reasonable management standard for evaluating prudence, the Commission employed a net benefits test. National contends that the Commission first adopted such a test for evaluating off-system sales in *Natural Gas Pipeline Company of America,* 28 F.E.R.C. ¶ 61,174, at 61,326–27 (1984), which was decided after National made the purchasing decisions in issue. National contends that the Commission thus improperly applied the net benefits standard retroactively.

We disagree with both of National's claims. The Commission's conclusion that National's purchases for off-system sales were imprudent was not based on an after-the-fact tally of the costs and benefits of the sales to National's on-system customers. Rather, the Commission examined National's records and determined that based on the information National had at the time it purchased the gas, the purchases were imprudent. That is, National purchased incremental gas for the off-system sales at costs greater than the GCR revenues National knew it would recover from those sales. The Commission can reasonably require that a prudent pipeline not purchase gas at rates that cause harm to the pipeline's on-system customers. The Commission did not apply a net benefits test per se, but merely concluded that in light of the disparity between the cost of the gas for the off-system sales and the GCR revenues from those sales, the purchases foresee-

ably caused harm to National's on-system customers and were thus unreasonable and imprudent.

Even if the Commission had applied a net benefits test, National could not claim that the use of such a test was improper. When the Commission first approved National's off-system sales in the section 7 certification proceedings, the Commission explicitly admonished that National should ensure that on-system customers would be no worse off than they would have been if the sales had not been made. *Certification Proceeding,* 24 F.E.R.C. at 61,609. National represented to the Commission that it would purchase gas from its lowest cost suppliers to cover the off-system sales approved in the section 7 proceeding, and that the sales would benefit National's on-system customers. *Id.* National thus knew it was expected to refrain from engaging in any off-system sales that would leave on-system customers worse off than if the sales had not been made.[1]

## B. The Commission's Application of its Standard

Even assuming that the Commission appropriately focused on the foreseeable detriment to on-system customers in evaluating the prudence of National's purchases of gas for off-system sales, National argues that the Commission applied its standard arbitrarily by employing a calendar year analysis rather than a storage year analysis; by using National's GCR revenues from its off-system sales to gauge the effect of the purchases and off-system sales on National's on-system customers, and by failing to adequately account for a number

---

1. Moreover, the net benefits test which the Commission endorsed in *Natural Gas Pipeline Company of America,* 28 F.E.R.C. at 61,326–27, was a test for evaluating the propriety of off-system sales for the purposes of section 7 of the NGA. National confuses the section 7 certification process with the section 4 prudence review when it claims that the Commission improperly applied the section 7 net benefits test retroactively in the section 4 proceeding at issue here.

National also argues that the Commission failed to follow this Court's direction in *OCC* that the Commission should examine the marketability of the purchased gas in order to deter-

mine whether the purchases were prudent. In *OCC* we considered whether gas purchases were abusive for the purposes of 15 U.S.C. § 3431(c)(2). In that case we explicitly noted that "abusive" is not synonymous with "imprudent." 783 F.2d at 220. The test for evaluating abusiveness has little bearing on the proper test for evaluating prudence, so even if the Court had focused on the marketability of the purchased gas in the *OCC* case, that would not mean that the Commission was required to consider this factor in the context of section 4 proceedings.

of the transactions' benefits to National's on-system customers.

### 1. *The Calendar Year Analysis*

██ The Commission compared National's costs and revenues for the 1984 calendar year in evaluating the propriety of National's purchases of gas for off-system sales. National contends that the Commission's approach was arbitrary in that a storage year analysis would have much more accurately replicated National's decision-making process and would have better reflected the transactions' prospective benefits to National's on-system customers.

Exhibit No. 14, which the Commission used in reviewing National's purchases, contained a calendar year analysis. National did not offer any storage year analysis of its own. The Commission thus concluded that the best record evidence available to it concerning the prospective effect of National's off-system sales was in Exhibit No. 14—the calendar year analysis. *Opinion No. 315-A*, 45 F.E.R.C. at 61,842. Because National failed to present any storage year analysis for the Commission to consider, we find that the Commission acted well within its discretion in employing the calendar year analysis reflected in Exhibit No. 14.

### 2. *The GCR Rate*

National sold the gas to its off-system customers at the Commission-approved I–1 rate. In the section 4 proceedings at issue here, though, the Commission compared the incremental cost of the gas purchased for off-system sales with the applicable GCR rate, which was lower than the full I–1 rate.[2]

National contends that the Commission arbitrarily used the GCR rate, rather than the full I–1 rate, in evaluating the effect of the sales on National's on-system customers. Because the Commission understated the revenues from the off-system sales,

National argues that the Commission failed to recognize that the purchases and sales would ultimately benefit National's on-system customers. Further, National claims that the Commission has never used a pipeline's GCR rate in evaluating off-system sales prior to or after its opinions in this case. The Commission's use of the GCR rate in this case was thus arbitrary, according to National.

██ We find that the Commission reasonably used the GCR rate in calculating the transactions' benefits to National's on-system customers. The Commission used the GCR rate rather than the I–1 rate because it had evidence that when National credited its PGA for the off-system sales, in order to cover the cost of the gas used to make the sales, National used the GCR rate rather than the I–1 rate. *Opinion No. 315-B*, 46 F.E.R.C. at 62,170. Thus, while National may have been taking in the full I–1 rate from its off-system customers, its on-system customers received benefits from the sales based on the lower GCR rate. The Commission also noted that National's own witness testified that the Commission should compare National's GCR rate to the cost of the incremental purchases used to make the sales in evaluating National's purchases and off-system sales. *Id.* We cannot say that the Commission acted arbitrarily when it decided to heed the advice of National's own witness by counting as benefits only the revenues from the off-system sales which actually did benefit National's on-system customers.

### 3. *Other Alleged Benefits*

██ National claims that its on-system customers received a number of other benefits as a result of the purchases and off-system sales and that the Commission arbitrarily refused to consider these benefits. The Commission rejected National's claim that its on-system customers benefited from the purchases because the purchases lowered National's overall WACOG. The

---

**2.** The Commission explains that the GCR rate is equal to the sum of National's monthly pipeline demand cost component, computed at a 100 percent load factor, and the commodity cost of gas associated with the applicable Rate Schedule

RQ commodity rate. *Opinion No. 315-B*, 46 F.E.R.C. at 62,170 n. 47. Again, the critical fact for our purpose is that the GCR rate is distinct from, and less than, the full I–1 rate.

Commission held that this claim was not controlling, even if true, since National's on-system customers may have been harmed by the purchases even if the purchases did lower National's WACOG. *Opinion No. 315–A*, 45 F.E.R.C. at 61,844. We find the Commission's conclusion on this point to be reasonable. The purchases in issue here were directly linked to National's off-system sales. That is, the off-system sales were supplied directly by these purchases, rather than from National's general gas supply. The Commission thus reasonably compared the costs of the purchases to the benefits from the sales, without rolling in the purchase costs with all of National's other gas acquisition costs in order to ascertain the effect of the purchases on National's WACOG. Even though the gas in question may have been purchased at rates lower than National's average cost of gas, the purchases may have harmed National's on-system customers if the purchases were made in order to facilitate sales at even lower rates than the purchase costs.

National also argues that its on-system customers benefited from the purchases and off-system sales because they avoided some fixed costs which were allocated to National's off-system sales; they avoided potential minimum bill liability as a result of the purchases; they faced lower gas costs because some of the storage space opened up by the off-system sales was refilled with cheaper spot market gas for which there would not have been storage space absent the off-system sales, and they faced reduced risks of take-or-pay liability as a result of the purchases. National argues that most of these benefits were explicitly noted by the Commission when it certificated the off-system sales in the section 7 proceedings, *Certification Proceeding*, 24 F.E.R.C. at 61,609, so the Commission's refusal to consider these benefits in this case was arbitrary.

We conclude that the Commission did not refuse to consider these alleged benefits. Rather, the Commission considered the claimed benefits and found that National had failed to provide any sort of quantified estimate of the extent to which the purchases for the off-system sales led to these benefits. The Commission acknowledged the possibility that some purchases may have been justified as enabling National to avoid minimum bill obligations to some pipelines, but found that National had not shown that this reasoning justified the particular sales at issue. *Opinion No. 315*, 44 F.E.R.C. at 62,056.[3] The Commission stated that if Exhibit No. 14 did not fully reflect the benefits to National's on-system customers of the purchases for off-system sales, such as the benefit from reduced potential minimum bill liability, then National should have filed a revised exhibit to make its case. *Opinion No. 315–A*, 45 F.E.R.C. at 61,843. By the same token, the Commission concluded that it was not clear from the record what level of off-system sales was necessary to recover the fixed costs allocated to such sales. *Opinion No. 315*, 44 F.E.R.C. at 62,056. Similarly, the Commission refused to take cognizance of the alleged take-or-pay costs which National avoided by making the purchases at issue. National only offered the ALJ general claims that the purchases and sales might reduce its take-or-pay liability. As the Commission stated, "Evidence concerning National Fuel's amorphous awareness of take-or-pay concerns during the off-system sales period in question should not be viewed as a substitute for more concrete analysis." *Opinion No. 315–B*, 46 F.E.R.C. at 61,171. National did not actually quantify these alleged benefits until its petition for rehearing, when the record was no longer open. *Opinion No. 315–A*, 45 F.E.R.C. at 61,843. Finally, the Commission rejected National's claim that its off-system sales program cleared storage space for cheaper spot market gas on the ground that National did not show what

---

**3.** The Commission also reasonably rejected National's claim that the purchases helped it avoid minimum bill obligations to supplier Transcontinental Gas Pipe Line Corporation ("Transco") for the independent reason that due to a settle-

ment agreement with Transco, National anticipated no minimum bill liability to that supplier at the time that National purchased the gas at issue here. *Opinion No. 315*, 44 F.E.R.C. at 62,056.

portion of the alleged spot purchase benefit resulted from National's off-system sales program. *Id.* at 61,174. The Commission thus did consider the various benefits alleged by National, but concluded that absent more particularized data from National it could not count these various alleged benefits in its calculations.

National asserts that the Commission cannot shield its flawed decisionmaking by imposing the burden of proof on the party challenging an action. *ANR Pipeline Company v. FERC*, 863 F.2d 959, 962 (D.C. Cir.1988); *Alabama Power Company v. FCC*, 773 F.2d 362, 366 (D.C.Cir.1985). We agree. However, in this case we have no reason to believe that the Commission's decisionmaking was flawed. National bore the burden of showing that its rates were prudent, and thus that its purchase costs were reasonable. 15 U.S.C. § 717c(e). The Commission reasonably concluded that National failed to satisfy this burden. National argued that the off-system sales program yielded a number of benefits to its on-system customers, but National did not even try to show the extent of these alleged benefits. We thus hold that the Commission did not act arbitrarily in refusing to recognize the various benefits to on-system customers alleged by National.[4]

## V. Conclusion

For the foregoing reasons, we find that the Commission acted within its discretion in finding that National's payments of gathering allowances to local producers were not excessive and abusive under section 601(c)(2) of the NGPA and in concluding that National's purchases of high cost gas for off-system sales were imprudent

under section 4 of the NGA. The petitions are therefore denied.

---

**4.** National's argument that the Commission acted arbitrarily in failing to find that the excess payments in this case were *de minimis* also lacks merit. The cases cited by National are all distinguishable. Moreover, just because the Commission has in the past allowed some excesses to go unchallenged, where it was reasonable to do so, does not mean that the Commission is bound to permit all relatively minor but nonetheless real abuses.

We also reject National's argument that the Commission arbitrarily expanded National's refund obligation in *Opinion No. 315–A* to apply to National's post–1984 purchases and off-system sales. The Commission had explicitly accepted National's subsequent PGA filings subject to the outcome of these proceedings. *See, for example, National Fuel Gas Supply Corporation,* 43 F.E.R.C. ¶ 61,376, at 61,981, 61,983 (1988).