# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 11, 2005          Decided April 15, 2005

No. 04-1157

NATIONAL TREASURY EMPLOYEES UNION,
PETITIONER

v.

FEDERAL LABOR RELATIONS AUTHORITY,
RESPONDENT

———

On Petition for Review of an Order of the
Federal Labor Relations Authority

———

*Timothy B. Hannapel* argued the cause for petitioner. On the briefs were *Gregory O'Duden, Larry J. Adkins,* and *Caryl L. Casden*.

*David M. Shewchuk*, Attorney, Federal Labor Relations Authority, argued the cause for respondent. With him on the brief were *David M. Smith*, Solicitor, and *William R. Tobey*, Deputy Solicitor.

Before: EDWARDS, SENTELLE and ROBERTS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* SENTELLE.

Concurring opinion filed by *Circuit Judge* ROBERTS.

SENTELLE, *Circuit Judge*: National Treasury Employees Union ("NTEU" or "the Union") petitions for review of a decision of the Federal Labor Relations Authority ("FLRA" or "the Authority"), wherein the Authority held that the United States Customs Service ("Customs" or "the Service") is not required to negotiate over a Union proposal concerning the storage of handguns. Although the Authority correctly ruled that the proposal came within the exemption of negotiability for "internal security practices" created by 5 U.S.C. § 7106(a)(1), the Authority erred in failing to follow its own precedent in determining whether the bargaining proposal constituted an "appropriate arrangement" subjecting it to bargainability under 5 U.S.C. § 7106(b)(3). Therefore, for the reasons more fully set out below, we grant the petition for review.

## I. Background

Petitioner Union represents Customs Service employees who, as a condition of their employment as law enforcement officers, are required to carry firearms. Customs employees have carried firearms as a part of their duties for many years, and over the years Customs has promulgated a number of internal security practices relating to the use and storage of those firearms. In 1986, Customs Directive No. 45-07 (Feb. 10, 1986) required that "[e]ach Customs officer carrying a firearm in the performance of official duties is responsible for the safe storage, operation, general care and maintenance of the firearm." In 1996, Customs issued a "Firearms and Use of Force Handbook," that again emphasized the individual employee's responsibility for securing his firearm: "Employees are expected to exercise good judgment in providing adequate security to all Service-issued and Service-authorized, personally-owned firearms." Finally, in 2000, Customs issued two policy statements on the subject of firearms. On March 3, 2000, the Acting Assistant Commissioner of Customs, Office of Field Operations, issued a

memorandum authorizing customs agents, at their election, to carry their firearms twenty-four hours a day. Prior to that time, Customs had directed employees to store their firearms overnight in the Customs facilities "where appropriate security is available," or to "go directly home from work" in order to secure their firearms at home. Under the new twenty-four-hour carry policy, the agency in effect decreased the burden on employees by removing the requirement of travel directly to and from home and work and giving them greater freedom of movement, subject to such restraints as avoiding the consumption of alcohol while carrying firearms.

On December 28, 2000, the Under Secretary of Treasury for Enforcement[1] issued a memorandum on the subject "Implementation of Treasury Firearm Safety and Security Policy," which detailed safety and security responsibilities required of firearms-carrying personnel. Among other things, the memorandum required that the firearm be placed in a secure locked container in a government office, or, if stored in a residence, that the employee install a safety lock device and guard against theft or unauthorized use of the firearm.

In response to the December 28, 2000 memorandum, the Union introduced a proposal that would have required Customs to provide secure on-site overnight firearms storage:

> Customs will ensure that either a lockbox or other secure and locked container such as a safe, file cabinet, or desk is

---

[1]At the time that this dispute began, the Service was part of the United Sates Department of the Treasury. It was transferred to the Department of Homeland Security pursuant to the Homeland Security Act of 2002, Pub. L. No. 107-296, *codified at* 6 U.S.C. § 203(1). Neither party suggests that this transfer affects any issue before this Court.

4

available at all government offices where armed employees work or are assigned. Routine overnight storage of a firearm in a government office is permitted.

*NTEU v. US Dep't of the Treasury, US Customs Service*, 59 F.L.R.A. 749 (2004). Customs declared the proposal nonnegotiable. The Union filed a petition for review with the Authority. The Authority held that the proposal interfered with Customs's right to determine its "internal security practices" under 5 U.S.C. § 7106(a)(1) and also that the proposal did not constitute a "procedure" or an "appropriate arrangement" under 5 U.S.C. §§ 7106(b)(2) & (3). Together, these holdings constitute the Authority's ruling that the proposal is nonnegotiable. The Union petitioned us for review.

## II. Analysis

The Federal Service Labor Management Relations statute, 5 U.S.C. §§ 7101-7135 ("the statute"), governs relations between federal agency employers and federal employees. The statute imposes a general duty upon the parties to bargain in good faith, 5 U.S.C. § 7117, subject to specified statutory exceptions. The Authority ruled that the proposal before it came within one of those exceptions. Specifically, the Authority relied upon the "management rights" section of the statute, which protects the authority of management officials and agencies, *inter alia*, "to determine the . . . internal security practices of the agency." 5 U.S.C. § 7106(a)(1). However, the management rights section limits that protection by providing that "[n]othing in this section shall preclude any agency and any labor organization from negotiating . . . procedures which management officials of the agency will observe in exercising any authority under this section; or . . . appropriate arrangements for employees adversely affected by the exercise of any authority under this section by such management officials." 5

U.S.C. § 7106(b)(2) & (3). The Authority went on to rule that the proposal before it did not constitute a "procedure" exempting the proposal from the management rights negotiability preclusion under § 7106(b)(2), or an "appropriate arrangement" exempting the proposal under § 7106(b)(3).

We review decisions of the Authority under the Administrative Procedure Act ("APA"), and will set such a decision aside when it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" *Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 97 n.7 (1983). We will apply that standard of review to each step of the Authority's decision.

First, the Authority concluded that the Service had established a link between its objective of securing its operations and its policy or practices, and that the proposal conflicted with its policy or practices. Therefore, the Authority held that the proposal affected management's right to determine its internal security practices under § 7106(a)(1). 59 F.L.R.A. at 753-54 (citing *Fraternal Order of Police, Lodge 1-F*, 51 F.L.R.A. 143, 145 (1995) ("*Lodge 1-F*")).

Second, the Authority concluded that the proposal required adoption of security measures to ensure a specific level of security. Therefore, the Authority held that the proposal was not a negotiable procedure under Section 7106(b)(2). *Id.* at 754 (citing *NFFE Local 1482*, 44 F.L.R.A. 637, 648 (1992)).

With respect to Sections 7106(a)(1) and 7106(b)(2), the Authority's decision quite clearly was not arbitrary or capricious. Storage of firearms at Service facilities certainly implicates management's right to determine its internal security practices. 5 U.S.C. § 7106(a)(1). Likewise, because the proposal would directly interfere with management's right to

determine its internal security practices by forcing the Agency to commit to a change in its current security practices, the proposal is simply not a negotiable procedure. 5 U.S.C. § 7106(b)(2); *AFGE v. Air Force Logistics Command*, 2 F.L.R.A. 604, 612-13 (1980), *aff'd sub nom. Dep't of Defense v. FLRA*, 659 F.2d 1140, 1159 (D.C. Cir. 1981).

However, the Authority and the court still are left with the question of whether the proposal constituted a negotiable "appropriate arrangement" under § 7106(b)(3). The Authority's conclusion on that subject is not so unassailable as the first two. Authority precedent established nearly twenty years ago holds that:

> In this and future cases where the Authority addresses a management allegation that a union proposal of appropriate arrangements is nonnegotiable because it conflicts with management rights described in section 7106(a) or (b)(1), the Authority will consider whether such an arrangement is appropriate for negotiation within the meaning of section 7106(b)(3) or, whether it is inappropriate *because it excessively interferes with the exercise of management's rights.*

*Nat'l Assoc. of Gov't Employees, Local R14-87 v. Kansas Army Nat'l Guard*, 21 F.L.R.A. 24, 31 (1986) ("*KANG*") (emphasis added). More specifically, the *KANG* test asks first what "the nature and extent of the impact experienced by adversely affected employees . . . is." 21 F.L.R.A. at 32. Otherwise put, the Authority determines "what conditions of employment are affected and to what degree." *Id.* If the effect is there so as to raise the opportunity of an appropriate arrangement, the Authority then asks "what is the precise limitation imposed by the proposed arrangement on management's exercise of its reserved discretion or to what extent is managerial judgment

preserved?" *Id.* In the present context, to apply the *KANG* test the Authority had to ascertain how the agency exercised its right to determine its internal security practices so that the Authority could then determine whether the proposal "excessively interfere[d]" with the agency's exercise of its right. In the decision before us, the Authority did not follow its own precedent established in *KANG*. *See, e.g.*, *Association of Civilian Technicians v. FLRA*, 370 F.3d 1214, 1221 (D.C. Cir. 2004) (vacating an Authority decision and directing application of the *KANG* test on rehearing).

It is well established that, despite the narrow scope of court review of FLRA decisions, any agency's "unexplained departure from prior agency determinations" is inherently arbitrary and capricious in violation of APA § 706(2)(A). *American Federation of Government Employees, Local 2761 v. FLRA*, 866 F.2d 1443, 1446 (D.C. Cir. 1989). The Authority's failure to follow its own well-established precedent without explanation is the very essence of arbitrariness. Therefore, we must set aside its determination that the proposal did not constitute an appropriate arrangement and return the question to the Authority for further proceedings consistent with this opinion and Authority precedent.

Under *KANG*, the Authority must conduct a so-called "excessively interferes with" inquiry "by weighing the practical needs of the employees and managers." 21 F.L.R.A. at 31-32. It did not do so on the present record. The Authority's path to error was set when it erroneously found that "the agency has exercised its right to determine its internal security by having employees who are trained and qualified to carry firearms maintain possession and access to their weapons when off duty." 59 F.L.R.A. at 754. That finding was crucial to the Authority's conclusion that the proposal "would operate so as to completely preclude the agency from exercising that right." In fact, the

record did not support the Authority's description of the agency's security policy. On the record, the agency apparently, in many locations, permitted on-site storage of firearms of off-duty officers, and, indeed, provided facilities for such storage. We are not suggesting that the Authority must rule that the agency must make such arrangements in all locations, but only that the Authority must consider the evidence in the record before it, conduct the balanced inquiry required by the *KANG* line of precedent, and then reach its conclusion as to whether the proposal "excessively interferes" with the agency's internal security practices.

On the record before it and this Court, the Authority has not established that the proposal would "negate and nullify" the agency's right to implement the practice it followed at the time the Union made the proposal. The most the proposal would require is the institution at other facilities of a method of carrying out agency internal security policies already in place at some locations. Whether this constitutes an appropriate arrangement is a question for the Authority to answer in the first instance, but it must do so on findings based on the record before it, and by a process consistent with its own precedent.

## III. Conclusion

For the reasons set forth above, we hold that the petition for review is allowed. The Authority's order is vacated and remanded for further proceedings consistent with this opinion.

ROBERTS, *Circuit Judge*, concurring: I agree with the court that the Authority was not arbitrary and capricious in determining that the Union's proposal implicated management's right to determine internal security practices, 5 U.S.C. § 7106(a)(1), and was not a negotiable "procedure," *id.* at § 7106(b)(2). The court goes on to fault the Authority for finding that the proposal was not an "appropriate arrangement," *id.* at § 7106(b)(3), because the Authority considered that question in light of the incorrect premise that agency policy required *all* employees to take their weapons home when off-duty.

The court is correct that this is not the agency policy, but it is arguable that the Authority appreciated this fact. *See*, *e.g.*, 59 F.L.R.A. at 753 ("The Agency has determined . . . that by not allowing storage during off-duty periods *at those facilities which lack adequate security*, it is reducing the risk of theft and furthering its asserted internal security practice determinations.") (emphasis added); *id.* at 755 (concluding that the Union's proposal "effectively overrid[es] the Agency's internal security determination *regarding those employees working at facilities and locations ill-equipped and unsuitable for off-duty storage of firearms*") (emphasis added). At the same time, it is difficult to fault the court's reading, given that the agency itself told the Authority below that agency "policy and practice . . . never authorized routine overnight storage of issued firearms in employees' work locations." Agency Statement of Position at 4.

Given all this, it is reasonable to read the Authority's analysis as the court does, and to find that analysis wanting. On remand, the Authority must consider whether the Union's proposal is an "appropriate arrangement" in light of a correct view of the agency's policy. I join the court's opinion on the understanding that nothing in it precludes the Authority from concluding on remand that the proposal to provide "a lockbox or other secure and locked container" for overnight storage of firearms "at *all* government offices where armed employees work or are assigned," 59 F.L.R.A. at 749 (emphasis added), completely overrides or excessively interferes with a policy of

allowing overnight storage only when the agency determines security at a particular location is adequate. *Cf. id.* at 755 n.5 ("The fact that the Agency provides overnight storage at some locations also constitutes a determination by management that security at those locations is safe and effective — itself an exercise of the right to determine internal security practices.").