Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports.  Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued January 9, 2006        Decided February 17, 2006

No. 04-1433

NATIONAL TREASURY EMPLOYEES UNION,
PETITIONER

v.

FEDERAL LABOR RELATIONS AUTHORITY,
RESPONDENT

---

On Petition for Review of an Order of the
Federal Labor Relations Authority

---

*Timothy B. Hannapel* argued the cause for petitioner. With him on the briefs were *Larry J. Adkins* and *Gregory O'Duden*.

*David M. Shewchuk*, Attorney, Federal Labor Relations Authority, argued the cause for respondent.  With him on the brief were *David M. Smith*, Solicitor and *William R. Tobey*, Deputy Solicitor.

Before: HENDERSON, ROGERS and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: In *National Treasury Employees Union v. Federal Labor Relations Authority*, 404 F.3d 454 (D.C. Cir. 2005) ("*NTEU I*"), the court granted the Union's petition and remanded the case to the Authority because its findings were unsupported by the record before it. The Union again contends that a negotiability ruling of the Authority on two Union proposals is arbitrary and capricious because they are unsupported by the record and contrary to Authority precedent. *See NTEU v. U.S. Dep't of Homeland Sec. Customs and Border Prot. of Wash., D.C.*, 60 F.L.R.A 367 (Nov. 8, 2004) ("Opinion"). We agree and grant the Union's petition for review.

## I.

The Federal Service Labor-Management Relations Statute, 5 U.S.C. §§ 7101-7135 (2000), governs relations between federal agency employers and federal employees. *See NLRB v. FLRA*, 2 F.3d 1190, 1192 (D.C. Cir. 1993). The Statute confers on federal employees a right to engage in collective bargaining with respect to conditions of employment through their representatives. *See* 5 U.S.C. § 7102(2). To effectuate this right, the Statute requires each agency to "negotiate in good faith" with the exclusive representative of the employees "for the purposes of arriving at a collective bargaining agreement." *Id.* § 7114(a). The Statute sets some limits on the subjects over which agencies are required to bargain. Certain management rights are exempt from the duty to bargain, *see id.* § 7106(a), including management's right "to determine the . . . internal security practices of the agency[,]" *id.* § 7106(a)(1). However, section 7106 also provides:

> Nothing in this section shall preclude any agency and

> any labor organization from negotiating . . . *appropriate arrangements* for employees adversely affected by the exercise of any authority under this section by such management officials.

*Id.* § 7106(b)(3) (emphasis added). The Statute further provides that, upon an agency's refusal to negotiate a proposal submitted on behalf of its employees, the Authority shall "resolve[] issues relating to the duty to bargain in good faith," *id*. § 7105(a)(2)(E), and that any person aggrieved by the Authority's decision may petition for review by a circuit court of appeals where the person resides or transacts business or to this court, *id*. § 7123(a). No objection not urged before the Authority shall be considered by the court, unless the failure to object is "excused because of extraordinary circumstances." *Id*. § 7123(c).

The National Treasury Employees Union represents U.S. Customs Service employees who have been carrying firearms as part of their duties for many years. According to undisputed facts recited in the Authority's Opinion, these employees are located in approximately 300 locations, only some of which have facilities for on-site storage of Agency-issued firearms during non-duty work hours. The Union identified approximately ten locations currently permitting such storage. Hence, at most locations Agency employees carrying firearms must travel directly from work to home and store their firearms overnight at home under secure conditions with an Agency-provided safety lock, unless they are covered by the 24-hour carry policy for Office of Field Operations Personnel promulgated by the U.S. Treasury Department.[1]

---

[1] At the time the Union petitioned for review by the Authority, the U.S. Customs Service was part of the Treasury Department and the bargaining unit employees were subject to both Treasury Department and Customs Service policies on firearms use

4

The 24-hour carry policy, dated March 3, 2000, provides that eligible Agency employees may carry their service-issued firearms twenty-four hours a day, provided they "significantly modif[y]" their behavior while armed. Such behavioral modifications and restrictions include refraining from the consumption of alcoholic beverages, limiting use of the firearm and concealing the firearm when the employee is not in uniform. The policy emphasizes that authority to carry a firearm "presents a tremendous responsibility and has potential for significant liabilities to the individual officer, as well as the Customs Service." Eligible employees who elect to be covered by the 24-hour carry policy and to be bound by its terms are not required to travel directly between home and work while carrying their Agency-issued firearms. Under the guidelines contained in the Agency's handbook on firearms, employees must maintain current credentials in order to carry a firearm, and the handbook lists the types of conduct that could result in the loss of credentials "based on a nexus between these actions and a threat to the safety of the employee or others." U.S. Department of the Treasury, U.S. Customs Service, *Firearms and Use of Force Handbook* (July 1996).

By the terms of the 24-hour carry policy dated December 28, 2000, all employees authorized to carry firearms in the performance of their official duties "are personally responsible for the security of all firearms to prevent unauthorized use, unintentional discharge, and theft," and specific requirements are set on how firearms not in the employee's immediate control are to be secured. The Union sought to bargain over implementation of the changes in the 24-hour carry policy and made a number of proposals, two of which are at issue here.

First, the Union proposed that employees who carry their

---

and storage. *See* Opinion at **1.

weapons to and from their residences be permitted "to make *reasonable diversions and stops* between their residence and work. These diversions and stops will be defined as those that any ordinary citizen would make before and after work," Proposal 11 (emphasis added). Examples of "reasonable diversions and stops" on which the Union sought to bargain included shopping at a supermarket, stopping for gas, or attending a child's after-school soccer match. The Union claimed that the proposal would mitigate the burden of the current policy, which restricts employees' freedom of movement without monetary compensation, reduces employees' non-duty hours, and increases the effort and expenses associated with the extra travel necessitated by the policy. The Agency advised the Authority that Proposal 11 interfered with management's right to determine its internal security practices, including the right to determine those policies and actions that will safeguard its personnel and physical property, and that employees with 24-hour carry authority who have completed firearms training are automatically eligible for that authority and were free to make reasonable diversions and stops. Because, in the Agency's view, the proposal applied only to employees who elected to carry personally-owned firearms and the Agency no longer permitted such carriage, the proposal was moot.

The Authority rejected the notion that Proposal 11 was moot, but concluded that Proposal 11 excessively interfered with management's right to determine its internal security practices under section 7106(a)(1) and thus was not within the Agency's duty to bargain under section 7106(b)(2). The Authority stated that the Agency had determined that, in order to safeguard its personnel, the public, and physical property, employees not covered by the 24-hour carry policy should be required to carry their firearms directly from work to home during non-duty hours, without stops, until their firearms could be secured. The Authority found that although Proposal 11 was an "arrangement

sufficiently tailored to aid those employees adversely affected by the exercise of a management right, as it would benefit only those employees who either fail training or refuse to sign the 24-hour carry certificate," Opinion at **11, it was not an "appropriate arrangement," *id*. The Authority reasoned that the "minimal benefit" to be gained by such employees who cannot or do not accept the conditions of the 24-hour carry policy "is more than outweighed by the Agency's interest in protecting the public from the danger posed by employees carrying firearms, especially if those employees are not operating under the restrictions concerning conduct provided for in the 24-hour carry policy." *Id.*

Second, the Union proposed that internal investigations upon suspension or rescission of an employee's authority to carry a firearm be conducted expeditiously. The Union made several proposals regarding suspension or rescission, including prompt notice to the employee of the reasons for the disciplinary action, with an opportunity to respond promptly and to appeal, and the Union's right to file a grievance, but only one is at issue on appeal. The Union proposed that "[i]n the event that [the Agency] takes an officer's firearm pending an internal investigation, it will conduct an *expeditious investigation on a priority basis*." Proposal 14(f) (first sentence) (emphasis added). In the absence of such language, the Union told the Authority, it "cannot show arbitrators any [contract] language which obligates the Agency to take *any* action within *any* time frames once it has removed firearm carriage authority," and that the Agency "has no incentive, and before an arbitrator it will argue it has no obligation, to conduct its investigations in an expeditious manner, and as a result its firearms investigations will continue in the same desultory manner that has been the case for years." Union's Response to Agency's Statement of Position, dated Jan. 14, 2002, at 25. The Union explained that the proposal would not prevent the Agency from taking the time

necessary to conduct a thorough investigation, but it would reduce the amount of time between the initial denial, revocation, or suspension of firearm carry authority and thus benefit the employee whose authority is ultimately reinstated. The Agency advised the Authority that Proposal 14(f) (first sentence) would require it to make a decision based on set time frames rather than on investigative facts and thus without full knowledge of the circumstances. The Agency also claimed that the proposal would interfere with management's right to assign work.

The Authority concluded, with one Member dissenting, that to the extent that Proposal 14(f) (first sentence) would require the Agency to conduct an expeditious investigation on a priority basis, the intrusion of the proposal into management's right to determine its internal security practices outweighed the benefits it would provide some employees and therefore was not an appropriate arrangement under section 7106(b)(3). The Authority construed the Union's proposal to "require the Agency to give investigations related to firearms carriage authority greater priority than any other investigations it conducts in the course of accomplishing the Agency's mission no matter how much more time-critical or important those other investigations might be." Opinion at **22. It rejected the Agency's position that the proposal would interfere with its ability to assign work.

## II.

In *NTEU I*, 404 F.3d at 458, the court remanded the Union's proposal concerning the storage of handguns after the Authority had ruled the proposal excessively interfered with management's rights to determine its internal security practices, because the Authority's determination was not supported by the record before it. The Union contends the same defects exist in the Authority's decision here, particularly as the Authority failed

to abide by its precedent requiring it to balance the practical effects of a proposal on management and employee interests. Specifically, the Union contends that the Authority's finding that Proposal 11 was of "minimal benefit" to Agency employees was without explanation or record support; that the Authority's finding regarding the Agency's interest in "protecting the public" is without record support and was not an interest asserted by the Agency; and that the Authority's implicit finding that employees not covered by the 24-hour carry policy pose a greater threat to the public than those who elect to be governed by its restrictions is contradicted by the record. Similarly, the Union contends that the Authority's finding that Proposal 14(f) (first sentence) would require the Agency to make investigations of suspended certifications to carry firearms the Agency's top priority is neither based on record evidence nor a burden that was asserted by the Agency. Because the Authority's determinations are not supported by the record, the Union maintains that the Authority did not engage in a proper application of its balancing test.

Our review is deferential, limited to determining whether the Authority's decision is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 97 n.7 (1983); *NTEU I*, 404 F.3d at 456; *Nat'l Ass'n of Gov't Employees, Local R5-136 v. FLRA*, 363 F.3d 468 (D.C. Cir. 2004); *Overseas Educ. Ass'n v. FLRA*, 827 F.2d 814, 816 (D.C. Cir. 1987); 5 U.S.C. § 706(2)(A) (2000).

The Authority applies a two-part test, known as "the *KANG* test," to determine whether proposals impinging upon management rights under section 7106(a) should nonetheless be considered negotiable under section 7106(b)(3) as "appropriate arrangements" for adversely affected employees. *See NTEU I*, 404 F.3d at 457; *NLRB,* 2 F.3d at 1192, *citing Nat'l Ass'n of*

*Gov't Employees Local R14-87*, 21 F.L.R.A. 24 (1986) ("*Kansas Army National Guard*" or "*KANG*"). Under the *KANG* test, the Authority first examines the record to determine whether a proposal is intended to be an "arrangement" for employees adversely affected by the exercise of a management right. *See KANG*, 21 F.L.R.A. at 31. The burden is on the Union to explain how employees will be detrimentally affected by management's action and how the proposal for bargaining is intended to address or compensate for such effect. *See id.* Under the second step, the Authority must evaluate whether an "arrangement" "is inappropriate because it excessively interferes" with the exercise of a management right. *Id.* This requires the Authority to "weigh[] the practical needs of employees and managers," *id*. at 31-32, and involves an "open-ended balancing analysis that may include consideration of such factors as 'the nature and extent of the impact experienced by the adversely affected employees' and 'the nature and extent of the impact on management's ability to deliberate and act pursuant to its statutory rights,'" *NLRB*, 2 F.3d at 1193, *citing KANG*, 21 F.L.R.A. at 31-32.

In *NTEU I,* the court held that the Authority erred in applying the *KANG* test to determine that a proposal did not constitute an "appropriate arrangement" subject to bargaining under section 7106(b)(3) because the record before the Authority did not support its description of the Agency's security policy. *See NTEU I,* 404 F.3d at 457-58. The Authority had concluded that a proposal on the storage of firearms would preclude the Agency from exercising its right to determine its internal security practices, notwithstanding the fact that the record established that in many locations the Agency had permitted on-site storage of firearms for off-duty employees and even provided facilities for such storage. *Id.* at 458. The court declared:

> On the record before it and this [c]ourt, the Authority has not established that the proposal would "negate and nullify" the [A]gency's right to implement the practice it followed at the time the Union made the proposal. The most the proposal would require is the institution at other facilities of a method of carrying out [A]gency internal security policies already in place at some locations. Whether this constitutes an appropriate arrangement is a question for the Authority to answer but it must do so on findings based on the record before it, and by a process consistent with its own precedent.

*Id.* (citations omitted).

Similarly here, the Authority found both Union proposals were arrangements within the internal security exception of section 7106(a)(1), but the Authority's determinations that the proposals were not appropriate arrangements is not supported by findings based on the record before it. The Authority reasoned that:

> Proposal 11 would require the Agency to permit employees who cannot or do not accept the conditions required for 24-hour carry authority to make stops between their work site and their residence, while in possession of their authorized firearm. This *minimal benefit* is more than outweighed by the Agency's interest in *protecting the public* from the danger posed by employees carrying firearms, especially if those employees are not operating under the restrictions concerning conduct provided for in the 24-hour carry policy.

Opinion at **14 (emphasis added). The Authority offers no explanation or basis in the record for its conclusion that the

benefit to the officers in being permitted to make the "reasonable diversions and stops" would be "minimal." Neither does the Authority explain its conclusion that this "minimal benefit" was "more than outweighed by the Agency's interest in protecting the public from the dangers posed by employees carrying firearms, especially if those employees are not operating under the restrictions concerning conduct provided for in the 24-hour carry policy." In purporting to describe the Agency's safety policy, the Authority pointed to nothing in the record to indicate that the Agency, in fact, has an internal security policy based on protecting the public from the greater danger posed by employees carrying firearms who are not bound by the 24-hour carry restrictions.

The Authority maintains on appeal that the restrictions in the 24-hour carry policy and the Agency handbook "are reasonably understood as objective evidence of [the Agency]'s public safety concern over the carriage of firearms by employees who are off-duty." Resp.'s Br. at 24. "Firearms are dangerous, and extraordinary dangers sometimes justify unusual precautions." *Florida v. J.L.*, 529 U.S. 266, 272 (2000). The question posed by the Union's proposal, however, is whether there is any material difference between the conditions under which employees who volunteer for the 24-hour carry policy carry firearms and the conditions under which other authorized employees carry firearms. The Union contends there are no material differences.[2] The Authority also maintains that

---

[2] Contrary to the Authority's position, 5 U.S.C. § 7123(c) does not bar consideration of the Union's challenges to the findings underlying the Authority's determination that its proposals were not appropriate arrangements, for the Union argued before the Authority that the proposals were appropriate arrangements and set forth its reasoning. *Cf. U.S. Dep't of Defense, National Guard Bureau, Rhode Island National Guard v. FLRA*, 982 F.2d 577, 580 (D.C. Cir. 1993).

Proposal 11 would have nullified certain safety-oriented restrictions on employee carriage of firearms off duty. Maybe so, but the Authority did not identify those restrictions in its Opinion, much less balance the practical effect of any differences against the employee benefits, which the *KANG* test requires. Finally, the Authority maintains that it was reasonable for it to recognize that the Agency has an interest in safeguarding the public as part of management's right to determine its internal security practices. Even so, this leaves open the question presented by Proposal 11. The Agency did not identify any specific safety concern to explain why employees who did not have 24-hour carry authority could not be granted some of the leeway in carrying firearms off duty that the 24-hour policy affords. Moreover, the Agency's reason for refusing to bargain over this proposal was that after completion of training all employees are automatically eligible for 24-hour carry authority. This lends some support for the Union's position that employees who do not have 24-hour carry authority do not pose any greater danger to public safety and, therefore, should not be bound by greater firearm carriage restrictions than those employees covered by the 24-hour carry policy.

The Union expressed concern that the internal security policy as stated by the Authority in its Opinion, and not advanced by the Agency, is so broad as to render any Union proposal involving firearms non-negotiable, rather than reflecting an actual *KANG* balancing of competing needs, which would give meaning to section 7106(b)(3). *See Am. Fed of Gov't Employees, AFL-CIO, Local 2782 v. FLRA*, 702 F.2d 1183, 1186-87 (D.C. Cir. 1983). The problem is not one of overbreadth but rather the Authority's dismissal without explanation of any counter-balancing benefit to employees under Proposal 11. The Authority may be of the opinion that no employee interest could outweigh the Agency's interest in controlling and restricting the use of firearms. It nonetheless

remains incumbent on the Authority in considering Proposal 11 to examine the record to determine the relevant differences, if any, between restrictions for employees who are and who are not subject to the 24-hour carry policy, to identify the significance of any differences, to weigh the practical effects of such differences on the competing interests under the *KANG* test, and to set forth its reasoning and the principles underlying its ultimate determination. *See NTEU I*, 404 F.3d at 458. The Authority has not yet done this.

As for Proposal 14(f) (first sentence), the Authority reasoned that expedited investigation related to firearm carriage authority would come at the expense of all other pending internal security investigations, and that this "intrusion upon the Agency's right to decide which investigative work is most important to the accomplishment of the Agency's operations outweighs the benefits." Opinion at **22. The opinion of the dissenting Member, who characterized the expeditious investigation provision of Proposal 14(f) as "a significant benefit for employees," *id*. at **34 (Member Pope, dissenting in part and concurring in part), highlights the problems with the Authority's determination. First, the Agency had failed to explain how expediting a relatively small number of cases would intrude on its management right. The dissenting opinion noted that the Agency had cited a survey showing the proposal would apply to only 55 out of 8,000 employees who have had their firearms authority removed for other than medical or qualifications reasons. Second, the Agency did not dispute the Union's claim that employees are unable to perform important aspects of their job when firearm carry permission is withdrawn. Third, the Agency never asserted that proposal caused the burden that the Authority found. Fourth, the Agency's claim that the proposal would require it to conclude investigations prematurely was not only "inconsistent with the wording of the proposal [but] expressly disavowed by the Union." *Id*. at **34.

On appeal, the Authority points to the Union's statement that its proposal called for firearm-authority investigations to be given priority in relation to other Agency investigations. This still is not the same as a proposal calling for top priority over all other Agency investigations. The Union's statement, viewed in context, was that its proposal was designed to provide employees with an expected time frame for completion of the internal investigation and some incentive for the Agency to conduct investigations more expeditiously. The Union submitted evidence that employees could not find out when their investigations might be completed and that investigations, despite Union inquiry, could linger for several years for no apparent reason, to the detriment of employee loyalty, motivation, and ability to earn overtime pay. The Union noted that the situation was exacerbated by the fact that the Agency was understaffed. Because the Authority's determination that Proposal 14(f) (first sentence) is not an appropriate arrangement is based on findings that are unsupported by the record and, in fact, appears to be contradicted by it and the Authority failed to engage in a proper *KANG* balancing, we reverse the non-negotiability determination.

Accordingly, we grant the petition, remanding Proposal 11 to the Authority to clarify its rationale and reversing the Authority's determination that Proposal 14(f) (first sentence) is not an appropriate arrangement under 5 U.S.C. § 7106(b)(3).