# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 16, 2008          Decided December 19, 2008

No. 08-1015

NATIONAL TREASURY EMPLOYEES UNION,
PETITIONER

v.

FEDERAL LABOR RELATIONS AUTHORITY,
RESPONDENT

———

On Petition for Review of an Order
of the Federal Labor Relations Authority

———

*Timothy B. Hannapel* argued the cause for petitioner. With him on the briefs were *Gregory O'Duden* and *Larry J. Adkins*.

*James F. Blandford*, Attorney, Federal Labor Relations Authority, argued the cause for respondent. With him on the brief were *Rosa M. Koppel*, Solicitor, and *William R. Tobey*, Deputy Solicitor.

Before: GINSBURG, TATEL, and BROWN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: This case presents the question whether the Federal Labor Relations Authority reasonably concluded that customs officers endanger themselves by growing certain styles of hair, beards, and mustaches. Petitioner National Treasury Employees Union argues that the U.S. Bureau of Customs and Border Protection (CBP) must negotiate over three union proposals to modify CBP's grooming standards policy. CBP claims that because these proposals would affect its right to determine its internal security practices, they are nonnegotiable. The union disagrees and argues in the alternative that its proposals were appropriate arrangements that did not excessively interfere with CBP's management rights. While we agree that CBP has no obligation to negotiate over two of the union's proposals, we remand the third proposal to the Authority to determine whether it represents an appropriate arrangement.

## I.

The Federal Service Labor-Management Relations Act, 5 U.S.C. §§ 7101–7135, requires federal agencies to bargain with public employee unions over employment conditions, but renders certain management rights nonnegotiable, including an agency's right to determine its "internal security practices," 5 U.S.C. § 7106(a)(1). When a union submits a proposal that would affect an agency's internal security practices, the agency can invoke this provision to relieve it of the obligation to negotiate over the proposal. To find that a proposal would affect the agency's right to determine its internal security practices, the Federal Labor Relations Authority must determine that the agency's policy is reasonably linked to the security of its operations, and that the union's proposal deviates from or modifies the policy. *See Nat'l Treasury Employees Union v. FLRA* ("*NTEU I*"), 404 F.3d 454, 456–57 (D.C. Cir. 2005). An agency may nevertheless be required to negotiate over a proposal which

would affect its right to determine its internal security practices if the union can establish that the proposal represents an "appropriate arrangement[] for employees adversely affected" by the agency's exercise of that right. § 7106(b)(3).

In assessing whether a proposal that would affect an agency's right to determine its internal security practices is nonetheless negotiable as an appropriate arrangement, the Authority applies the "*KANG* test." *See Nat'l Treasury Employees Union v. FLRA* ("*NTEU II*"), 437 F.3d 1248, 1252–53 (D.C. Cir. 2006) (citing *Nat'l Ass'n of Gov't Employees, Local R14-87* ("*Kansas Army National Guard*" or "*KANG*"), 21 F.L.R.A. 24 (1986)). Under this test, the Authority requires the union to establish that the proposal is in fact intended as an arrangement to benefit employees. If the union does so, then the Authority balances the "'practical needs of employees and managers'" to see if the proposal "'excessively interferes'" with management rights. *NTEU II*, 437 F.3d at 1253 (quoting *KANG*, 21 F.L.R.A. at 31–32).

Therefore, in order to conclude that an agency has no obligation to negotiate over a proposal, the Authority must determine, first, that the proposal would affect the agency's right to determine its internal security practices and, second, that the proposal does not qualify as an appropriate arrangement. While the Authority may make the first determination without requiring the agency to produce evidence if the connection is obvious, *see, e.g.*, *U.S. Dep't of Def. Fort Bragg Dependents Sch.*, 49 F.L.R.A. 333, 343 (1994), its second determination must be supported by record evidence, *e.g.*, *NTEU I*, 404 F.3d at 458.

As part of the process of establishing the Department of Homeland Security, Congress created the U.S. Bureau of

Customs and Border Protection (CBP) from components of the Department of Agriculture and the former Immigration and Naturalization Service and U.S. Customs Service. Although CBP employees perform various customs-related functions, this case concerns only those uniformed officers stationed at ports of entry to the United States and charged with preventing illegal entry of individuals and contraband.

In late 2003, several months after CBP's formation, the agency replaced the various predecessor agency uniforms with a single uniform worn throughout the agency. The next year, CBP unilaterally implemented a grooming standards policy that superseded those of the predecessor agencies. In addition to requiring officers to style their hair in accordance with several specifications, the policy prohibited all facial hair other than beards maintained for medical reasons and "conservative" mustaches kept within "the corners of the mouth" and above "the upper vermillion of the lip." CUSTOMS & BORDER PROTECTION, DEP'T OF HOMELAND SEC., CBP NATIONAL UNIFORM PROGRAM ch. 3, at 6 (2004) ("CBP POLICY").

Petitioner National Treasury Employees Union filed a grievance over CBP's unilateral implementation of these policies. Agreeing with the union on this point, the Authority affirmed an arbitrator's award prohibiting the agency from implementing the policy until the completion of bargaining. *Nat'l Treasury Employees Union*, 62 F.L.R.A. 263 (2007).

As part of the bargaining process, the union submitted several proposals to modify the grooming standards policy, of which only Proposals 2, 4, and 6 are at issue here. Proposal 2 sought to secure CBP's agreement that "the official uniform, when worn in its entirety, affords sufficient identification of the officer as a representative of CBP." *Nat'l Treasury*

*Employees Union* ("*Negotiability Order*"), 62 F.L.R.A. 267, 269 (2007) (internal quotation marks omitted). Under Proposal 4, uniformed officers could exhibit "contemporary grooming styles, subject to the terms of [the agreement between the union and CBP], provided that the styles do not create a health or safety hazard, or interfere with or tend to interfere with the accomplishment of the mission of CBP in a particular situation by reducing the ability to deal effectively with either the public, fellow employees, other government agencies or other organization entities." *Id.* (internal quotation marks omitted). The relevant portion of Proposal 6 would permit neatly-trimmed beards and facial hair of no more than one inch in length "except where there is a reasonable likelihood that an officer will need to use a respirator or other device in the performance of his job duties and the device requires a cleanly shaven face." *Id.* at 274.

The Authority concluded that all three proposals were nonnegotiable. Proposals 2 and 4, it found, would affect CBP's right to determine its internal security practices by interfering with CBP's linked goals of identifying officers as such and presenting a professional image to the public. *Id.* at 270–72. The Authority then concluded that because each proposal would excessively interfere with management rights—Proposal 4 by injecting an "undefined and ambiguous" element into CBP's policy, *id.* at 273, and Proposal 2 by preventing CBP from requiring any grooming standards policy on the basis of officer identification, *id.* at 272—neither qualified as an appropriate arrangement. As to Proposal 6, the Authority found that the relevant language would affect CBP's right to determine its internal security practices because the proposal failed to account for emergency situations where officers might have to use respirators to save their own or others' lives and there was no time to shave. *Id.* at 278. It also found that Proposal 6 did not

qualify as an appropriate arrangement because the risk of such emergency situations outweighed the benefit the proposal would confer on officers.  *Id.* at 278–79.

Petitioning for review, the union argues that the Authority failed to base its findings on record evidence and reached an unreasonable conclusion.  As to Proposals 2 and 4, the union points out that the only evidence CBP submitted was the grooming standards policy itself and similar policies of other law enforcement agencies and military units, and argues that the Authority did not rely on the evidence in any event.  Regarding Proposal 6, the union counters the Authority's concerns about respirators by pointing to uncontroverted record evidence that the officers were neither subject to any respirator policy nor even issued respirators. Reviewing under the arbitrary and capricious standard, *e.g.*, *Bureau of Alcohol, Tobacco & Firearms v. FLRA*, 464 U.S. 89, 97 n.7 (1983), we consider Proposals 2 and 4 in Section II and Proposal 6 in Section III.

## II.

The union argues that the Authority erred in finding that Proposals 2 and 4 would affect CBP's right to determine its internal security practices and that they did not qualify as appropriate arrangements.  We reject both contentions.

The Authority accepted CBP's explanation that its grooming standards policy was intended to "safeguard its uniformed officers by ensuring that they are readily identifiable to the public and by increasing the officers' ability to effectively employ law enforcement techniques." *Negotiability Order*, 62 F.L.R.A. at 271.  Accordingly, it found CBP to have established a reasonable link between its grooming standards policy and its internal security goals.  *Id.* It then found that Proposal 2, by entirely negating the link

between officer grooming and officer identification, and Proposal 4, by "effectively requir[ing] the Agency to grant exceptions," would each modify the grooming standards policy. *Id.* at 272. As a result, the Authority concluded that both proposals would affect CBP's right to determine its internal security practices.

The union first argues that the Authority should have based its conclusion on record evidence and didn't. But it did. CBP submitted as evidence its judgment that "[a] good personal appearance adds to [CBP officers'] prestige, and is an essential part of 'officer presence', i.e. <u>officer</u> <u>safety</u>." CBP POLICY, ch. 3, at 3; *see also id.* ("It is . . . imperative to the CBP mission that officers project a neutral image that minimizes public antagonism and ensures approachability by the broadest possible spectrum of the domestic and international public. Extremes and fads in personal appearance and attire are, therefore, prohibited . . . ."). Though this assessment appears in the document setting forth the grooming standards policy's requirements, it clearly represents an independent statement of CBP's judgment regarding the connection between the policy and its security, and the union has provided no reason for treating this evidence as outside the record.

Although the Authority included no citation to this evidence, referring only to CBP's statements of its litigation position, those litigation statements articulated the same reasoning as the record evidence. *Compare Negotiability Order*, 62 F.L.R.A. at 271–72, *with* CBP POLICY, *supra*, ch. 3, at 2–3. To be sure, the Authority would have aided our review by actually citing the record evidence, but we have no doubt that the evidence formed the basis of its decision. *See, e.g.*, *Am. Fed'n of Gov't Employees, Nat'l Border Patrol Council, Local 2366, AFL-CIO v. FLRA*, 114 F.3d 1214, 1218

(D.C. Cir. 1997) ("'[W]e will . . . uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned' . . . ." (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983))).

We also reject the union's claim that even if the Authority relied on record evidence, its finding of a reasonable link between the agency's policy and its internal security was nonetheless substantively arbitrary and capricious. According to the union, the Authority should have followed its reasoning in *National Treasury Employees Union*, 61 F.L.R.A. 48 (2005), where it found aspects of CBP's uniform policy not reasonably linked to its internal security practices. But that case considered a uniform policy not applied consistently to all officers. *See id.* at 51 ("[T]he Agency fails to explain why uniformed personnel at the locations excepted from the policy [requiring trousers] are sufficiently identifiable for security purposes while wearing shorts, but such personnel in every other Class 3 work environment would not be."). As CBP applies the grooming standards policy at issue here consistently, the Authority's earlier decision is of little relevance. That some of CBP's predecessor agencies had different grooming standards policies alters this conclusion not at all: CBP need show only that its policy is reasonably linked to its internal security, not that the policy is the only possible way to preserve internal security. We therefore have no basis for second-guessing the Authority's reasonable conclusion that officer grooming provides incremental benefits to officer identification and self-presentation beyond the mere wearing of a uniform, and thus that CBP's grooming standards policy is reasonably linked to its internal security practices. As the Authority reasonably concluded based on record evidence contained in CBP's policy that Proposals 2 and 4 would affect CBP's right to determine its internal security practices, we need not decide

whether it relied on the evidence of practices of other law enforcement agencies, or whether it could properly have reached this conclusion without relying on any evidence whatsoever.

For similar reasons, the Authority reasonably concluded that Proposals 2 and 4 are not appropriate arrangements under the *KANG* test. Given the Authority's acknowledgment that the proposals were intended as arrangements, the only remaining issue is whether the Authority reasonably found that they would "excessively interfere[]" with management rights, *KANG*, 21 F.L.R.A. at 31. The Authority reasoned that Proposal 2, by deeming grooming standards irrelevant for the identification of uniformed officers, would completely "prevent the Agency from requiring officers to adhere to any grooming standards designed to ensure that the officers are readily identifiable to the public." *Negotiability Order*, 62 F.L.R.A. at 272. Similarly, the Authority found that Proposal 4's license to display "undefined and ambiguous 'contemporary grooming styles,'" *id.* at 273, would prevent CBP from enforcing a clearly-defined grooming standards policy. For these reasons, the Authority concluded that Proposals 2 and 4 would excessively interfere with CBP's right to determine its internal security practices.

Relying on the record evidence discussed above, the Authority identified and considered the interests at stake, and we have no cause to overturn its reasonable weighing of those interests. Contrary to the union's argument, this case is unlike two recent decisions where we concluded that the Authority failed to address record evidence that suggested internal inconsistencies in the agency's policy. *See NTEU I*, 404 F.3d at 458; *NTEU II*, 437 F.3d at 1254–55. Here, relying on evidence demonstrating the connection between CBP's grooming standards policy and its internal security, the

Authority reasonably found that the union's proposals would excessively interfere with agency security by effectively nullifying CBP's decision to adopt a clear and standardized policy.

The union leans heavily on *American Federation of Government Employees, AFL-CIO, National INS Council*, 8 F.L.R.A. 347 (1982), *rev'd on other grounds sub nom. U.S. Dep't of Justice, INS v. FLRA*, 709 F.2d 724 (D.C. Cir. 1983), in which the Authority found a proposal similar to Proposal 4 negotiable as an appropriate arrangement. *Nat'l INS Council*, 8 F.L.R.A. at 353. But the Authority decided that case under its pre-*KANG* standard. *See id.* at 353. And although in one post-*KANG* case the Authority applied *National INS Council*'s mode of analysis in order to answer a different legal question than the one at issue in *KANG*, *see Am. Fed'n of Gov't Employees, Nat'l Border Patrol Council*, 31 F.L.R.A. 1123, 1136 (1988), numerous cases have since made clear that *KANG* sets forth the standard for appropriate arrangement determinations, *see, e.g.*, *Ass'n of Civilian Technicians, P.R. Army v. FLRA*, 534 F.3d 772, 777 (D.C. Cir. 2008). Neither of these cases, therefore, provides a reason to upset the Authority's balancing of interests under the *KANG* test. Finally, the union's contrary argument notwithstanding, the Authority's decision in the related grievance proceeding, *supra* at 4, has no bearing upon the present controversy, as it involved a different legal question and was not part of the record before the Authority here.

We thus conclude that the Authority acted neither arbitrarily nor capriciously in determining that Proposals 2 and 4 are nonnegotiable.

### III.

The union argues that the Authority erred in concluding both that a portion of Proposal 6—which would allow officers to maintain neatly-trimmed beards of up to one inch unless there was a reasonable likelihood they would be required to use respirators—would affect CBP's right to determine its internal security practices and that the proposal did not qualify as an appropriate arrangement. For the reasons given above, however, we see no abuse of discretion in the Authority's finding of a reasonable link between CBP's grooming standards policy and its internal security. And because Proposal 6 was plainly intended to modify the policy, *Negotiability Order*, 62 F.L.R.A. at 278, the Authority acted neither arbitrarily nor capriciously in finding that it would affect CBP's right to determine its internal security practices.

That said, we agree with the union that the Authority's appropriate arrangement analysis was faulty. The Authority found that the relevant portion of Proposal 6 would excessively interfere with CBP's management rights by preventing the agency from "requiring officers who have facial hair to use respirators in an emergency situation." *Id.* at 278. Yet the Authority pointed to no evidence that CBP had any respirator policy whatsoever. Indeed, while CBP claims that it had a *goal* of adopting policies that would require respirators and of training officers in their use, Agency Reply to Union Resp. 10; Oral Arg. at 22:20–22:48, the record contains evidence, albeit fragmentary, that CBP's current policies did not require officers to use respirators, Union Resp. to Agency Stmt. of Position Ex. 13; that many CBP officers were never even issued respirators, *e.g.*, *id.* Exs. 6, 9–10; and that CBP relied not on its own officers but on other agencies to respond to emergency situations requiring respirators, *see id.* Ex. 8 (indicating that the Port Huron office calls the local fire department to respond to situations

requiring respirators). One email stated that CBP officers in at least one location are currently "not allowed to enter any environment where the use of a respirator is required," and that the hazardous environment policy "is to identify when a hazardous condition exists, restrict access by establishing a quarantine zone, and notify[] appropriate port authorities or other haz[ardous] mat[erials] units to respond to the situation." *Id.* Ex. 12. Though if credited, this evidence would significantly diminish CBP's interest in facilitating its officers' use of respirators, the Authority considered none of it.

Thus, contrary to the *KANG* standard, the Authority failed to base its appropriate arrangement analysis on record evidence. *See NTEU I*, 404 F.3d at 458 ("[T]he Authority must consider the evidence in the record before it, conduct the balanced inquiry required by the *KANG* line of precedent, and then reach its conclusion as to whether the proposal 'excessively interferes' with the agency's internal security practices."). Accordingly, we shall remand Proposal 6 to the Authority so that it may determine, based on record evidence, whether the portion governing facial hair constitutes an appropriate arrangement.

## IV.

For the foregoing reasons, the petition for review is granted in part and denied in part, and the case is remanded to the Authority for further proceedings consistent with this opinion.

*So ordered.*